Milton ALTSCHULER et al., Plaintiffs,

v.

Robert COHEN et al., Defendants.

Civ. A. No. 75–H–1632.

United States District Court,
S. D. Texas,
Houston Division.

June 25, 1979.

Barry Allen Brown and Mark Grossberg, Houston, Texas, for plaintiffs.

Merton B. Goldman and Herbert Lackshin, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND FINDINGS OF FACT

COWAN, District Judge.

### I.

### ISSUE AND BASIC DECISION

█ The parties have submitted the facts and the law to the court. The central issue is: Have these plaintiffs been victimized by material misrepresentations relating to "JV–102"? The answer is: "No."

The essential facts are: Plaintiffs, well-educated, sophisticated, high-tax bracket investors, entered a land syndication. The principal motivation was the accurate belief that the tract had great value and appreciation potential.

The tract was an excellent one. Plaintiffs would have enjoyed a profit if they had liquidated earlier, or if they had held through the hard times (from the standpoint of the real estate market) of late 1973, 1974 and 1975.

Plaintiffs' loss occurred because they decided to abandon their venture at an inopportune time.

Plaintiffs have not proved misrepresentations or material non-disclosure. In any event, any misrepresentations (if there were any) were not material; the really material fact was that plaintiffs accurately perceived the value and appreciation potential of the tract.

### II.

### DETAILED FACTUAL BACKGROUND

Defendant Cohen is a mature businessman. In the early 1970's having retired from his furniture business, he determined to "put together" syndications to buy raw land in the burgeoning Houston real estate market. Cohen has never been personally close to any of the plaintiffs. He had met various of them because in 1965 he served as the president of Temple Emanu El.

The record is hazy concerning Charles Zeller. Zeller did not appear and testify at trial; his deposition, if taken, was not introduced in evidence. Apparently, however, Zeller is an experienced real estate man.

The Realamerica Management Corporation (hereinafter "Realamerica") is a corporation, holding a real estate brokerage license. The stock of Realamerica was owned by Cohen and Zeller.

Real Estate Management, Inc., one of the defendants herein, is a real estate management company owned by Cohen and Zeller.

During the latter 1960's and the early 1970's, real estate syndication was popular among high-bracket tax payers. The concept was that a group would purchase a tract of land, hold it for at least six months in order to enjoy long-term capital gains, and sell the land after a fairly brief holding period. Considerable money was made during the latter 1960's and the early 1970's. All of the plaintiffs participated in a number of these syndications before becoming members of "JV–102," the syndication which gave rise to this controversy.

The raw land purchased by JV–102 is herein called the "Roane tract." The Roane tract is, and at all material times has been, an excellent, strategically located tract. The 100-acre tract fronts the Eastex Freeway, which proceeds out of Houston in a generally northerly direction and skirts the Houston Intercontinental Airport on the east. Since the opening of the Houston Intercontinental Airport in the late 1960's, the entire area has grown phenomenally, and has been characterized by the development of highly successful residential subdivisions inhabited primarily by middle and upper income homeowners. A very large amount of commercial development has occurred on major traffic arteries in this area.

The Roane tract is a long, narrow tract with its long side fronting upon the freeway. The north 20 acres of the tract is close to, but does not abut, the San Jacinto River. It is undisputed that the property is well-drained. Although there was some apprehension among the plaintiffs, in the year 1975, that the property might be included "within the 100-year flood plain," the evidence reveals with little doubt that drainage has never been a serious problem. There has never been any realistic basis for substantial fear that the property could not be developed or that the value of the property, on a permanent basis, would be impaired by any serious drainage problem.

The parties have presented only one appraisal witness, David R. Bolton, an M.A.I. appraiser, who testified to his opinion that the value of the land at the time the syndicate purchased it was $24,000 per acre. The court accepts the credibility and reliability of Mr. Bolton's testimony. The plaintiffs purchased the property for $22,000 per acre, and at the time they abandoned the investment in 1975, were offered an accommodation which would have resulted in their acquisition of the property, had they gone forward with the investment, for approximately $17,000 per acre.

At the time of the formation of JV–102, the Roane tract was owned by Grant Roane, a responsible attorney and real estate developer. Roane had purchased the property from a Houston developer, Fred Rizk, for cash in 1971 and paid approximately $15,000 per acre to Rizk. Roane has testified, and the court credits his testimony, that it was possible to purchase the property for $15,-000 per acre because he paid Rizk cash.

Roane financed the purchase by borrowing $1,500,000 from the Capitol National Bank. After one year, Roane "moved" this indebtedness to Center Savings Association.

The basic concept of JV–102, from the standpoint of a participant, was that a participant would buy one or a number of 4% interests in the syndicate. A purchaser of one 4% interest in the syndicate would make an initial investment, in the first year, of $9,200. This initial investment involved no tax advantage because this was the payment of the down-payment of the purchase price.

In addition, each participant would commit himself to pay taxes on the property during a five-year period and to make an interest payment of approximately $6,200 each year. The interest payment, of course, was tax-deductible as were the taxes. The concept was that at some point during the five-year period the property would be sold at an appreciated price and the investors would enjoy capital gains on the difference between their basis and the sales price.

These plaintiffs actually made an excellent investment. Their loss was solely attributable to the fact that they either panicked or became prematurely discouraged and refused to go forward at an inopportune time. This conclusion is supported by the following facts:

1. In September of 1972, just a few months after entering their initial venture, the plaintiffs received an opportunity to realize a very handsome profit. Plaintiffs Exh. 10 is an earnest money contract which, if accepted by the joint venture, would have resulted in a very substantial gain. Although plaintiffs suggest that the earnest money contract identified by Plaintiffs Exh. 10 was not bona fide, there is absolutely no evidence to that effect.

   Cohen and Zeller recommended that the earnest money contract not be accepted and that a counter-offer be made. One of the reasons why the offer identified in Plaintiffs Exh. 10 was not accepted was that many of the joint venturers, including a number of the plaintiffs, believed that the property was much more valuable than did either the offerors or Cohen, and they wished to hold out for a much larger price.

2. In 1973 and 1974, the speculative bubble burst. For a relatively brief period of time the real estate business in Houston was in the doldrums. People like Grant Roane and Center Savings found themselves over-extended. Money was tight. People "ran away" from these syndications. Rather than holding on to their excellent investment during these hard times, the plaintiffs elected to "walk away" from the deal. The evidence reveals to the court's complete satisfaction that if the plaintiffs had continued in their investment, had made the interest payments, had accepted the reduction in the note offered by Roane, it would have been possible for them to realize ultimately a very handsome profit.

### The Plaintiffs

All of the plaintiffs, with the exception of Allen Lockshin, are physicians. Morris, Paul and Julien Rosenthal practice medicine together, and Harold Joachim and Milton Altschuler are close personal friends of the Rosenthal brothers. Allen Lockshin is in the real estate business.

With all respect to the various plaintiffs, it is apparent to the court that the real "leaders" of the "Rosenthal group" are Paul and Morris Rosenthal. Both Morris and Paul Rosenthal are extremely experienced, highly competent real estate investors. The information which they were able to recite verbatim on both direct and cross-examination persuades the court that both of these gentlemen are highly intelligent, very sophisticated investors, completely aware of all of the nuances, possible hazards and possible rewards and penalties of raw land syndication. Many of the other plaintiffs very properly and wisely relied upon the experience and expertise of Morris and Paul Rosenthal.

The Seventh Circuit Court of Appeals has wisely stated in *Kohler v. Kohler Co.*, 319 F.2d 634, at 641 (7th Cir. 1963) that:

   . . . honesty and fairness permit consideration of the actual and normal business acumen of the seller. (i. e., the plaintiff there).

The Rosenthal plaintiffs were "bullish" on JV–102 because at the time JV–102 was offered to them, they were in the process of realizing a very large profit as a result of a syndication of property in the same neighborhood.

### The Offering Document

In the early months of 1972, Cohen and Zeller became aware of the possibility of purchasing the 100-acre Roane tract.

Cohen and Zeller, after entering an earnest money contract with Roane, prepared the document which appears in this record as Plaintiff Exh. 8 and which is a brochure setting forth the essential elements of JV–102. JV–102 was Cohen's second syndication. Cohen testifies, and the court credits his testimony, that after preparing the brochure for JV–101 and submitting it to investors, he had determined that the brochure for JV–101 was too detailed and bulky. He had received complaints from investors concerning the length of the offering document. He determined to shorten and abbreviate the offering brochure of JV–102.

The offering brochure for JV–102 is a concise, direct document. The brochure contains the following significant provisions:

1. The presentation "should be considered only by individuals of adequate means to maintain the continuing obligations." (See p. 3 of Plaintiffs Exh. 8).

2. "All agreements, provisions, terms and conditions will be included in the closing documents. . . . They are available for inspection." It is significant, in the court's view, that the offering document did not purport to spell out all of the details of the closing but merely offered the potential investor an opportunity to review all of the closing documents if he wished to do so. This was an opportunity which none of the plaintiffs seized, although Dr. Paul Rosenthal testifies that he requested copies of the closing documents, orally, and never received them. None of the plaintiffs ever made written demand for copies of the closing documents or visited Realamerica's offices to review the closing documents.

The court is persuaded that the plaintiffs were motivated primarily by their accurate perception that the tract was valuable and had apprecia-

tion potential and that plaintiffs were not interested in the details of the transaction, including the manner in which defendants and their employees were compensated. Plaintiffs' actions—in failing to examine the closing documents—are much more persuasive than their present testimony, which has the tone of self-serving, retrospective rationalization.

3. Realamerica would receive 10% of the joint venture profits, if any, and Realamerica, or its designee, would receive a bona fide real estate commission in connection with the resale of the property.

4. The offering document made no statements concerning whether a real estate commission would be paid in connection with the conveyance of the property from Grant Roane to the joint venture.

5. The offering document, which is essentially merely three maps, a one-page description of the proposal, also incorporates by reference, an appraisal report dated May 30, 1972, from David R. Bolton. Bolton has testified, and the court is persuaded that he is a competent, honest appraiser, that his appraisal was an honest one and it accurately describes the property, its potential and its value as of the date of the appraisal.

*Plaintiffs' Contentions Concerning Deceit and Court's Findings Relating to Contentions*

Plaintiffs contend that they were deceived in the following respects:

1. Grant Roane paid a 6% real estate commission to Realamerica. This $106,000 commission was received by Realamerica and paid, in part, to salesmen, like Bobby Hammond, who had been engaged by Realamerica, on commission, to sell interests in JV–102. Plaintiffs contend that the payment of this commission was con-

cealed from the plaintiffs. Some of the plaintiffs testify definitely that they would not have entered the transaction if they had known of the payment of this commission from Roane to Realamerica. Other plaintiffs testify that they possibly would not have entered the transaction if they had known of this commission.

2. At the time of the conveyance from Roane to the joint venture, the possibility existed that Shindler-Cummings, a real estate brokerage firm active in real estate syndication, might have a claim for a commission in connection with the sale from Roane to the joint venture. Although the facts on this matter were not fully developed, it is apparent that both Roane, Cohen and Zeller feared the assertion of a claim but were not certain that it would be asserted. In order to provide some insurance against the assertion of this claim, Roane was induced to accept $21,350 per acre rather than $22,000 for the property. Thus Roane conveyed the property for $21,350 per acre to Leon Hirsch, and Hirsch, as Trustee, conveyed the property to the joint venture for $22,000 per acre. The concept of this arrangement was that if Shindler-Cummings never asserted a claim for a commission, the joint venture would be given the benefit of this $80,000 "spread."

As things developed, Shindler-Cummings never claimed a commission, and the plaintiffs, had they remained in the investment, would have received the benefit of the "spread."

Although Morris Rosenthal admits that he was fully aware of this "two-tier" arrangement, plaintiffs assert they did not know of this "two-tier" deal. Some of the plaintiffs testify that they definitely would not have entered the transaction if they had known of this "two-tier" arrangement; and others testify that they "might" not have entered the transaction.

3. Plaintiffs apparently contend, although the nature of their contention is not completely clear from their testimony and seems to be abandoned in oral argument, that the property had drainage problems, was so situated that it might be included within the "100-year flood plain," and that the value of the property was seriously impaired by virtue of these drainage problems. This contention seems to have been effectively abandoned during trial and at oral argument.

With reference to the allegation concerning "concealment" of the commission paid by Roane to Realamerica Corporation, Cohen testifies credibly (and the court accepts his credibility) that he did not intentionally "conceal" this commission. He also introduces evidence, through Hammond, that Realamerica salesmen actually revealed this commission to the plaintiffs. Cohen testifies that the fact that the commission to Realamerica was not revealed in Plaintiffs Exh. 8 was an inadvertence; he points out and documents, that in each of the other four syndications which he put together in the year 1972, the fact of his company's receiving a commission on the sale was disclosed. He testifies that the non-disclosure in Plaintiffs Exh. 8 was simply the result of his efforts to condense the document, and was not an effort on his part to conceal the commission. He testifies that he had no reason to conceal the commission, was not ashamed of it, and that Realamerica made its living by charging real estate commissions. He also testifies, and the court believes with considerable justification, that the arrangement between the seller and the seller's broker, insofar as the commission is concerned, was a matter which was solely the business of the seller and his broker, and was really no one else's business.

Plaintiffs' complaints with reference to the alleged non-disclosure of the commission are not meritorious because:

1. The principal material fact was the value and potential of the land. The

land was being purchased at a good price. A 6% commission did not materially effect the validity of the investment.

2. Payment of a real estate commission is certainly a customary and normal matter, and plaintiffs should have expected that a real estate commission was being paid by Roane.

Hammond, the salesman who conferred with each of the plaintiffs, has testified credibly that he told each of the plaintiffs that he was receiving a commission. This fact, and the general knowledge that a commission is paid in most real estate transactions, should have placed the plaintiffs on notice that a real estate commission was probably being paid.

3. Bobby Hammond, the salesman for Realamerica, has testified persuasively (and the court accepts his credibility) that it was his general practice to tell investors that he was in the business of selling real estate for a commission and that he received a commission. The court credits and believes Hammond's testimony. Plaintiffs were busy doctors, with numerous investments, busily engaged in their medical practices and in making numerous investments. The court is not persuaded that the plaintiffs are able to remember the details of the oral presentation made to them by Hammond.

4. If the plaintiffs were actually interested in the fact of the commission, they could have easily discovered its payment by examining the closing papers, which were available to them for inspection.

5. In 1975, when the plaintiffs were attempting to make a decision as to whether or not to continue with their investment, the plaintiffs learned of the commission and the "two-tier" aspect of the transaction, but made no complaint concerning these matters and did not state that this was one of their reasons for abandoning the venture.

6. The court accepts the credibility of Mr. Cohen's testimony that the nondisclosure of the commission was in fact an inadvertent omission and not an active, intentional concealment. The court accepts Cohen's testimony because it is consistent with the brochures which he prepared in connection with his other joint ventures. In addition, the market for interests in joint ventures was so spectacular in 1972 that there would have been no reason to conceal the commission. The syndication would have been readily marketable in any event.

7. The flood plain panic was never a serious problem. Inclusion of property in the "flood plain" normally did not mean that the property could not be developed—it merely meant that it would be necessary to elevate structures built on such property so that the structures were above that level established as the flood plain. The property in question was so valuable and so strategically located, that it was always readily apparent that it would be possible to add another foot or two to the foundation of the building and thus build in the flood plain. The court does not know whether the plaintiffs were really worried about the flood plain or whether this was merely a pretext to justify an abandonment of the venture, but in any event if the plaintiffs' fears about the flood plain were genuine, they were ill-founded. Defendants cannot be charged with panic resulting from misconceptions and misinformation concerning the "flood plain."

*History of Abandonment of the Venture and Disposition of the Counterclaim*

In 1973 and 1974, the joint venturers paid their taxes and made their interest pay-

ments. In 1975, however, the joint venturers elected not to move forward with their investment. This abandonment occurred under the following circumstances:

Drs. Rosenthal had a patient, Major Charles W. Tennemeyer, U.S. Army. Major Tennemeyer has not testified as a witness in this case, but certain of his views appear herein in Plaintiffs Exh. 20, which has been placed before the court over the defendants' objection that it is in fact hearsay insofar as Major Tennemeyer's views are concerned.

Major Tennemeyer's views as set forth in his letter of February 5, 1975, are, however, not particularly alarming. These views merely support the fairly obvious proposition that the only effect of the "100-year flood plain" even if it were held to be applicable to a portion of the property in question, would be that the costs of developing the property would be slightly increased.

During the months after February of 1975 and through the summer of 1975, the joint venturers held three or four meetings to determine an appropriate course of action. Many of the venturers wished to continue, but the "Rosenthal group" apparently decided that further participation in the venture would be "pouring good money after bad." At one of the meetings, Dr. Morris Rosenthal and his present counsel indicated that he desired those venturers who wished to continue to "buy out" the position of the Rosenthal group. When those venturers who wished to continue pointed out that the Rosenthal group had nothing to sell, Dr. Rosenthal responded by stating that he and his group would create a cloud on the title and thus prevent the other venturers from continuing. This statement caused considerable anger and distress, and rather promptly Dr. Rosenthal and his counsel realized that this was not an appropriate course of action and sent a telegram to the other venturers stating that his group would not place a cloud on the title. This threat by Dr. Rosenthal is the basis of the defendants' counterclaim.

■ The court rejects the validity of the counterclaim. Dr. Rosenthal's comments are not a breach of any legally cognizable duty. No cloud was placed upon the title. No lis pendens notice was filed. Dr. Rosenthal and his counsel promptly notified the other venturers that his group would not stand in the way of the other venturers proceeding. Cross-plaintiffs have not proved that their damage was proximately caused by any breach of legal duty by Dr. Rosenthal and his group.

Significantly, however, in all of the various meetings concerning what course of action to take, the Rosenthal group, although then knowledgeable of the commission and the "two-tier" arrangement, made no complaint of those matters. The court is persuaded, from the evidence, that the commission and the "two-tier" aspect of the transaction played no material part in the Rosenthal group's decision to abandon their investment. The court is persuaded that this abandonment was simply the result of discouragement and the inability to foresee that the recession in the Houston real estate market, which was severe in 1973, 1974 and early 1975, would be rectified in 1976, 1977 and thereafter. In short, the "Rosenthal group" simply got out at the wrong time. This business decision is not a matter which can properly or equitably be charged to the defendants.

### III.

### DAMAGES AND CLAIM AGAINST ZELLER

■ Plaintiffs' case must also fail because there is no appropriate legal or equitable relief. The traditional rule of damages for a fraudulent misrepresentation is the difference between the amount of consideration paid and the value of the property, if it were as represented. In the present case, the defendants have established, by credible evidence, that the value of the property at the time the defendants purchased their interest was greater than the

amount of the defendants' investment in the property.

■ Rescission, in the court's view, is not equitable. An investor in a typical, highly leveraged land syndicate is very much like a player at the roulette wheel. He pays money for a chance at speculative appreciation. Although the plaintiffs here ultimately lost their money, they had their turn at the wheel. They received their opportunity. The opportunity was a good one. Had their business decisions been different, they would have obtained some gain. Rescission under this set of circumstances is, in the court's view, totally inequitable and gives the plaintiffs something which they had no reasonable expectation of obtaining—a guarantee that they would get their money back.

■ Zeller defaulted—did not appear at trial; but plaintiffs are not entitled to judgment against him without establishing, by competent proof according to an established legal standard, their damages.

## IV.

### SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The plaintiffs' interests which they purchased were "securities." Although the plaintiffs were primarily dependent for success upon economic trends, it is also true that they were primarily passive, and were to some degree dependent upon management skills of the syndicators. Investors in any enterprise are, to varying degrees, subject to economic trends and the success of their investment is dependent upon, in part, economic trends. It was not contemplated that plaintiffs themselves would actively participate in the management of the affairs of the venture. Plaintiffs invested for the purpose of creating profits through efforts of the defendants in conjunction with what was hoped to be favorable economic trends. Defendants' skill in marketing the property was a material factor in the success of the enterprise.

2. The plaintiffs, while basically comforted by the fact that Mr. Cohen had been the president of the congregation of the Temple Emanu El, did not basically rely upon the reputations of either Zeller or Cohen, but relied upon their evaluation of the property and its appreciation potential.

3. The property, both at the time of the investment of the joint venturers and at the time the plaintiffs abandoned their investment, was a good property, having a market value of approximately $24,000 per acre.

4. The plaintiffs have not proved from a preponderance of the evidence that material misrepresentations were made to them or that they were the victims of material non-disclosure.

5. Plaintiffs, at all material times, were experienced and sophisticated real estate investors.

6. Facts concerning the $106,000 commission and the two-tier aspect of the transaction were readily discoverable, at all material times.

7. The most significant factor in the Rosenthal group's decision to invest in JV–102 was the very substantial profit which the Rosenthals had enjoyed upon a property in the immediate neighborhood.

8. The drainage of the property in question is in fact good, and the controversy and concern about the "flood plain" has never had a materially detrimental effect upon either the ability to develop the property or to market it.

9. In 1972, at the time of the formation of the joint venture, the defendants had no knowledge that the flood

plain would ever present a problem, and in fact had no knowledge concerning the development of the facts set forth in Major Tennemeyer's letter of February 5, 1975 (Plaintiffs Exh. 20). Even in 1975, available information about the "flood plain" was vague, indefinite and debatable. In 1972, insofar as this evidence reveals, there was virtually no available information concerning the "flood plain" or its effect upon the development of properties.

10. The credibility of the plaintiffs' testimony that they were motivated to default by discovery of the commission and the "two-tier" aspect of the transaction is specifically rejected.

## V.

### ANALYSIS OF AUTHORITIES

One logical starting point is *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). This case by tenants of low income cooperative housing projects alleged violation of the federal securities laws. The majority of the Supreme Court held that shares of stock which entitled purchasers to lease an apartment in a state-subsidized and supervised non-profit housing cooperative were not "securities" within the purview of the Securities Act of 1933.

New York State had passed a statute which seeks to encourage private developers to build low-cost cooperative housing by providing long-term, low-interest mortgage loans and substantial tax exemptions. A developer agrees to operate the facility on a "non-profit basis" and may lease apartments only to persons whose incomes fall below a certain level.

Co-op City was developed by United Housing Foundation, a nonprofit membership corporation. To be eligible to acquire an apartment in Co-op City, a prospective purchaser was required to buy 18 shares of stock for each room desired. The key to Justice Powell's reasoning lies in his language, relating to the price paid for the shares of stock, in which he says at 421 U.S. 842, 95 S.Ct. 2055:

. . . [T]heir purchase is a recoverable deposit on an apartment. The shares are explicitly tied to the apartment: [T]hey cannot be transferred to a nontenant; nor can they be pledged or encumbered; and they descend, along · with the apartment, only to a surviving spouse . . .

The district court reasons that ". . . The fundamental, non-profit nature of the transaction" presented an insurmountable barrier to the respondent's claims in the federal courts.

Perhaps the most helpful and relevant portions of Justice Powell's opinion appears at 421 U.S. 849, 95 S.Ct. 2059, where he says:

The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system; the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interests of investors. Because securities transactions are economic in character, Congress intended the application of these statutes to turn on the economic realities underlying a transaction and not on the name appended thereto.

Justice Powell discussed *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). That was a case, in fact the earliest case, in which assignments of interests in oil leases coupled with the promoter's offer to drill an exploratory well were held to be securities. *Joiner* is like the present case; there the investors were primarily relying upon either the potentiality of a piece of property coupled with some entrepreneurial skill, i. e., the drilling of an

exploratory well, by the developer. The investors put in money, in the hope of obtaining profit, primarily betting upon the presence of oil. Here, the investors put in money primarily betting upon land appreciation. In both instances, the promoter did something, but the success of the venture was not primarily dependent upon what the promoter did but upon the validity of the investor's hypothesis that either there was oil under the property, or, as in the present case, that the property would appreciate in value.

Also significant in *Forman* is Justice Powell's language at 421 U.S. at 851, 95 S.Ct. at 2060, where he said:

> Despite their name, they lack what the court in *Tcherepnin* [*Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564] deemed the most common feature of stock: [T]he right to receive 'dividends contingent upon an apportionment of profits.' 389 U.S. at 339, 88 S.Ct. at 555.

Justice Powell's language at 421 U.S. 852, 95 S.Ct. 2060 is significant. He said:

> This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra,* (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is 'attracted by the prospects of a return' on his investment. *Howey* [*SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244], *supra,* at 300, 66 S.Ct. at 1103. By

contrast, when a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves' as the *Howey* court put it, *[I]bid* —the securities laws do not apply.

The case of *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90 (10th Cir. 1971) is not close on the facts but leads one to an understanding of what is meant by 'materiality.' Reliance in that case is upon the case of *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2nd Cir. 1965) Vol. 6, Loss, Chapter 11C at 3876–83. The inquiry is whether " 'the misrepresentation is a substantial factor in determining the course of conduct which results in the investors' loss.' "

In the case at bar the court concludes that actually Cohen made no misrepresentation. Alternatively, the misrepresentation or non-disclosure, even if it is assumed that there was one, was not a substantial factor in determining the course of conduct which resulted in the investors' loss. The conduct which resulted in the investors' loss was entering a real estate transaction, which as it turned out, required a long-term commitment, to make a profit. As matters developed, plaintiffs did not possess the determination to make such a commitment.

*Mitchell v. Texas Gulf Sulphur* is cited here for the proposition that ". . . Restitutionary damages and rescission are an available equitable remedy where there is privity or unjust enrichment." The facts in *Mitchell* bear no similarity whatever to the facts in the case at bar. *Mitchell* involved a case where the company published what was found to be an intentionally over-gloomy assessment of certain mineral finds. Plaintiffs had sold their stock in reliance upon this gloomy information, when in fact much greater optimism was justified. The situation is, in the court's view, totally distinguishable. The actual measure of damages applied in that case was the intermediate value of stock between the time of its sale and a reasonable time after the owner had received notice of the true facts so as to

enable him to replace the stock. The case does, however, attempt to apply the basic rule that the objective is to place the party back in the same situation which he would have enjoyed had it not been for the fraudulent inducement.

In this particular case, it would not be fair, in the court's opinion, to simply give the plaintiffs their money back. They had their turn at the roulette wheel. They had the opportunity of making a great profit, and in fact would have made at least an acceptable profit if they had held on to their investment for a longer period of time.

One basic case relating to the proper measure of damages in a securities case is *J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *Case v. Borak* is an opinion by Justice Clark involving a case charging deprivation of pre-emptive rights by reason of a merger between J. I. Case and the American Tractor Corp. The allegation was that the merger was effected through the circulation of a false and misleading proxy statement by those proposing the merger.

*Case v. Borak* enunciates some general principles concerning the power of the federal courts to grant equitable relief.

*Wheat v. Hall*, 535 F.2d 874 is a Fifth Circuit opinion, affirming a decision by Judge Bue. It is important, however, that in that case Judge Bue did not give an investor his money back, but merely rescinded a stock purchase agreement and an accompanying indemnity agreement and promissory note. That case involved a "grossly misleading balance sheet" and assurances by the seller that the purchaser would incur no financial liability as a result of the stock purchase, and that the stock purchase was a sound investment.

The opinion is, however, significant in determining the test of materiality. The test of materiality is "whether a reasonable man would attach importance to the fact misrepresented in determining his course of action." Citing *John R. Lewis, Inc. v. Newman*, 446 F.2d 800, 804 (5 Cir.); cf. *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 2131, 48 L.Ed.2d 757 (1976). Even sophisticated investors are entitled to protection of this rule. *Stier v. Smith*, 473 F.2d 1205, 1207 (5 Cir.).

The principle teaching of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) as it relates to the case at bar, is that the plaintiffs were required to prove that the defendants intended to deceive, manipulate or defraud the plaintiffs. The court is persuaded, from all of the evidence detailed above, that there was no intent on the part of the defendants to deceive, manipulate or defraud the plaintiffs. On the contrary, as Leon Hirsch put it, it was well understood by all of the parties that "this was a straight land deal." As the court construes that phrase, Hirsch meant that all parties fully understood that the key question in this investment was the value of the property, and the question of whether or not it would appreciate as rapidly as the plaintiffs wished. The plaintiffs lost money only because they turned down the first chance that they had to make a good profit on the transaction, and thereafter declined to "stay the course" during the 1973–75 recession in the Houston real estate market.

At the time the case at bar was filed in 1975, there was authoritative support for the proposition that civil liability under Sec. 10(b) of the Securities Act, and Rule 10B–5 could be predicated upon mere negligence. See cases collected in f. 12, 425 U.S. at 193, 96 S.Ct. 1381. In this connection, however, even were it not for the *Hochfelder* case, the undersigned is persuaded that the defendants in this case were not guilty of fraud, deceit or negligence. There is a complete absence of evidence that the Corps of Engineers studies and possible rulings with reference to the "flood plain" in 1972 were known to anyone, or presented any type of a negative influence upon the property in question.

One of the comprehensive recent decisions of the Fifth Circuit Court of Appeals relating to elements which a plaintiff must establish to recover under SEC Rule 10B–5 is *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir. 1977). The facts there are clearly distinguishable from the facts in the case at bar because that was a case in which one brother had actively deceived another concerning the value of the victim's interest in a real estate investment. Judge Wisdom points out, however, that in order to establish a right to private recovery, a plaintiff must establish the following:

1. The scienter of the defendant.
2. The materiality of any misrepresentation or omission by the defendant.
3. The extent of actual reliance by the plaintiff on the defendant's statements.
4. Justifiability of the reliance, translated into a requirement of due diligence by the plaintiff.

Evaluating each of these elements, the undersigned finds that plaintiffs have not established any intentional misrepresentation. The omission to make statements concerning the commission and the "two-tier" aspect of the transaction was not intentional concealment and was not material because such omission did not actually affect the value or the soundness of the plaintiffs' investment.

The plaintiffs have not established "reliance" because the court is persuaded that the principal reliance of the investors in this case was upon their own evaluation of the value of the property, which actually was an accurate evaluation. In the court's judgment, the only representations upon which the plaintiffs actually relied concerned the location of the property and the terms of the financing. ·

The plaintiffs, in the court's view, exercised due diligence because they made what was actually an excellent investment; however, if the matters of the "commission" or the "two-tier" aspect were really important

to the plaintiffs (a proposition which the court does not accept), facts relating to these matters could have easily been discovered by the exercise of due diligence since there was no active concealment, or intentional concealment with reference to these matters.

The leading cases in connection with the materiality requirement are collected in F. 14 of Justice Wisdom's opinion in *Dupuy v. Dupuy,* 551 F.2d at 1014.

The court in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, at 381 (2nd Cir. 1974) discusses the difference between proof of "loss causation" and "transaction causation." In the case at bar, this distinction is largely immaterial because the court is factually persuaded that the plaintiffs have demonstrated neither "loss causation" nor "transaction causation." In a transaction of this nature, the really material facts are the location of the property, its potential for appreciation, the price and the terms. The arrangement between the seller and his agent is a matter which is really none of the purchaser's business and is totally immaterial from an investment standpoint, so long as the price paid is a reasonable one. Here the price paid was a reasonable one, as demonstrated by all of the evidence. In this connection, see *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) and *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228, 240 (2nd Cir. 1974).

## VI.

## CONCLUSION

For the reasons stated herein, the court is entering judgment for defendants.