Frank C. PASTERNAK; Antoine J. La-Badie; Harold J. Barbret; James H. Wickham; Otto J. Blattler; Ona M. Greve; David G. Brednel; Robert Semeniuk; Gerald W. Tremblay; John Hirschmann; Richard M. Szymanski, Venturers of Sioux Shares Co.

v.

SAGITTARIUS RECORDING CO.; Frank J. Van Arsdale; Shelley Whalen; Booth, Lipton & Lipton; Philip Pierce; Frederick M. Mintz; A.V.I. Records, Inc.; A.V.I. Records Distributing Corp.; Raymond Harris,

and

BOOTH, LIPTON & LIPTON,
Third-Party Plaintiff,

v.

ROSE, FELDMAN, RADIN, PAVONE & SKEHAN, Third-Party Defendant.

No. 82–CV–70500–DT.

United States District Court,
E.D. Michigan, S.D.

Sept. 24, 1985.

ORDER DENYING PLAINTIFFS' MO-
TION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANT
BOOTH, LIPTON & LIPTON'S MO-
TION FOR SUMMARY JUDGMENT
AND MEMORANDUM

COHN, District Judge.

For the reasons stated in the accompanying memorandum, it is ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED, and that Defendant Booth, Lipton & Lipton's Motion for Summary Judgment is GRANTED, and that Booth, Lipton & Lipton and Third-Party Defendant Rose, Feldman, Radin, Pavone & Skehan are DISMISSED as defendants.

MEMORANDUM

I.  Plaintiffs' Motion for
Summary Judgment

A.

Plaintiffs' claims arise out of their participation as venturers in Sioux Shares Company, a Michigan joint venture. Each of the individual plaintiffs contributed varying sums of cash and promissory notes sometime between early April and early August of 1981, for the purpose of forming Sioux Shares as an investment vehicle. On August 10, 1981, Sioux Shares entered into three Master Recording Lease Agreements with defendant Sagittarius Recording Company (Sagittarius). Under the agreements, Sagittarius was to have bought title to certain master recordings from defendants American Variety International Records, Inc. and American Variety International Records Distributing Corp. (AVI). Sagittarius would then lease those recordings to Sioux Shares, which would have them produced and distributed for a substantial profit. As an additional benefit to plaintiffs, Sagittarius was to have passed the Investment Tax Credit (ITC) for the master recordings through to Sioux Shares, to be claimed by plaintiffs on their 1981 federal income tax returns. As the basis for their belief that they would be entitled to the ITC, plaintiffs claim to have relied on the opinion of defendant Booth, Lipton & Lip-

Frederick A. Patmon, Hallison H. Young of Patmon & Young, Detroit, Mich., for plaintiffs.

John J. Ronayne, Chester E. Kasiborski, Jr., of Van Til, Kasiborski & Ronayne, Detroit, Mich., for third-party defendant Rose, Feldman, Radin, Pavone & Skehan.

Michael Sullivan, Clayton Farrell of Collins, Einhorn & Farrell, Southfield, Mich., for Booth, Lipton & Lipton.

ton (Booth), a New York law firm. Booth prepared tax opinion letters on October 6, 1980 and June 25, 1981 advising Sagittarius of the tax consequences in respect to Sagittarius's acquiring and subsequent leasing of the master recordings. The lengthy 1981 opinion contained in Sagittarius's offering brochure is the foundation of plaintiffs' claims against Booth. Sagittarius failed to deliver the master recordings to plaintiffs' chosen manufacturer/distributor, Rosanova Productions, Inc. (Rosanova), thus preventing plaintiffs from reaping their expected profits and taking the ITC on their 1981 tax returns.

Plaintiffs request summary judgment as to Counts III, V, VII, and VIII of the Amended Complaint. Count III is against AVI for tortious interference with Sioux Shares's lease contract with Sagittarius. Count V is against Booth for common law fraudulent misrepresentation, both intentional and innocent. Count VII is against AVI for violation of the Securities and Exchange Commission's Rule 10(b)–5, 17 C.F.R. § 240.10b–5, for material misrepresentations in the sale of a security. Count VIII is for injunctive relief to prevent AVI from destroying or concealing relevant documents and things. Alternatively, plaintiffs ask for partial summary judgment against Booth as to the common law claims for fraudulent and innocent misrepresentation, and against AVI for tortious interference with prospective advantages.

Defendant Booth and third-party defendant Rose, Feldman, Radin, Pavone & Skehan ("Rose")—an accounting firm upon whose statements Booth relied for some of its tax opinions in this matter—have responded. AVI has not responded and is currently unrepresented by counsel.

Plaintiffs' motion papers offer no support other than all "the records and files of this action." Attached to the motion is a 208 paragraph document entitled "Plaintiffs' Statement of Material Facts Not in Dispute;" it is merely a copy of plaintiffs' abbreviated "Proposed Findings of Facts." Many, if not most, of the "facts not in dispute" are unsupported by any reference to the record. The document is repetitive and reads more like a complaint. Further, plaintiffs offer no legal support or argument to show that they are entitled to judgment as a matter of law.

### B.

Booth and Rose have filed complementary motions and briefs in opposition to the motion of plaintiffs. Booth points out that plaintiffs have failed to identify what material facts are not in dispute, and that they are really asking me to support their motion for them by sifting through the entire record. Rose concurs and additionally points out that, even if plaintiffs did show there is no dispute as to material facts, they have failed to show they are entitled to judgment as a matter of law.

### C.

Plaintiffs have a heavy burden. They must clearly show the true facts and exclude any real doubt as to the existence of any genuine issue of material fact. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728–29, 88 L.Ed. 967 *reh'g denied*, 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593 (1944); 6 *Moore's Federal Practice* ¶ 56.15[3], at 56–466 to –467. They must also show that they are entitled to judgment as a matter of law. *Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 344 (6th Cir.1984). Furthermore, plaintiffs' supporting papers are closely scrutinized, while the papers of the opposing parties are indulgently treated. *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155 (6th Cir. 1980). The evidence must be viewed and all inferences must be drawn therefrom in the light most favorable to the opposing parties. *Smith v. Hudson*, 600 F.2d 60 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

Plaintiffs have certainly failed to establish that they are entitled to judgment as a matter of law. Plaintiffs have never submitted any legal argument regarding their claims. Plaintiffs have never argued the elements of their claims, nor shown how they satisfy those elements. In fact, in plaintiffs' "Anticipated Contested Legal Is-

sues" (the only place where plaintiffs cite any legal authority), plaintiffs admit the contestability of the elements for: tortious interference (Count III), fraudulent or innocent misrepresentation (Count V), the securities claim (Count VII), and injunctive relief (Count VIII).

■ Plaintiffs' failure to show they are entitled to judgment as a matter of law is sufficient to deny their motion in all respects without prejudice.

## II. Booth's Motion for Summary Judgment

### A.

As to plaintiffs' claim (Count V) based on fraudulent misrepresentation, Booth argues that plaintiffs cannot show Booth's misrepresentations proximately caused plaintiffs' harm—a required element—because it was AVI and Sagittarius's failure to deliver the masters to plaintiffs' chosen manufacturer/distributor, Rosanova, that proximately harmed plaintiffs. Even if Booth's representations had been true, plaintiffs still would have been harmed by the failure to deliver. Rose concurs in this defense. Booth adds further that plaintiffs cannot show they were harmed by any act or omission of Booth, especially since Sagittarius returned to plaintiffs all monies paid by them as part of a consent judgment between these parties. As to plaintiffs' claim based on innocent misrepresentation, Booth argues that plaintiffs have not pleaded the required elements; alternatively, even if they did, plaintiffs cannot establish privity between themselves and Booth or show that their losses inured to the benefit of Booth—required elements. For purposes of this motion only, Booth accepts as true the allegations of the misrepresentations and plaintiffs' reliance thereon.

### B.

Plaintiffs' first response to Booth's motion simply says that Booth has not shown the absence of any triable issue of material fact. At a hearing on September 6, 1985, the Court asked plaintiffs to identify more specifically the documents that would support an inference that Booth knew AVI or Sagittarius did not intend to ever deliver the masters to plaintiffs' chosen manufacturer/distributor. In a 29 paragraph "Supplemental Response," plaintiffs identify documents that they say would support an inference of Booth's knowledge of such intentions by AVI and Sagittarius. The Supplemental Response fails to show a dispute as to the sole material issue raised by Booth's motion, i.e., whether Booth knew prior to June 25, 1981, the date of its 1981 tax opinion, of any intention not to deliver the masters. The Supplemental Response largely addresses issues such as whether Booth knew facts that would negate the tax benefits of the master leasing program or make the master leasing program a "security" under the securities laws. As discussed *infra*, the failure of Sagittarius to deliver the masters makes these other issues causally irrelevant as to Booth's liability.

### C.

#### 1. Intentional Misrepresentation Claim

##### a.

Booth lays out the six elements for a common law claim for fraudulent misrepresentation in Michigan: (1) That the defendant made a material misrepresentation; (2) that it was false; (3) that the defendant knew the statement was false when made, or made the statement recklessly, without any knowledge of its truth and as a positive assertion; (4) that the defendant made it with the intention that it should be acted upon by the plaintiff; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff thereby suffered injury. *See Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). For purposes of this motion, Booth concedes that plaintiffs satisfy the first five elements. This leaves the requirement that Booth's misrepresentations be the proximate cause of harm to plaintiffs. *Rosenblatt v. Ivory Storage Co.*, 262 Mich. 513, 517, 247 N.W. 733 (1933), cited with approval by W. Keeton & W. Prosser, *Handbook on the Law of Torts* § 110, at 767 (5th ed. 1984).

**1518**

In *Rosenblatt*, the plaintiff had entered into a warehouse storage agreement with the defendant based upon the latter's false representation that the warehouse was fireproof. It was not, and plaintiff's goods were destroyed by fire. The defendant attempted to escape liability by arguing that plaintiff's loss was "caused" not by the misrepresentation, but rather by a fire for which the defendant was not responsible. The argument was rejected by the court: "[T]he loss grew out of the very subject-matter of the fraud, the misrepresentation that the building was fireproof." *Id.* at 515–16, 247 N.W. 733.

Plaintiffs' alleged harm in this case stems first and foremost from the failure of Sagittarius to deliver the masters to Rosanova by December 31, 1981. This caused plaintiffs to lose the benefits of the lease contract with Sagittarius, including the ability to take the ITC on their 1981 tax returns. While plaintiffs might not have entered into the contract "but for" the representations of Booth, Booth argues that any harm suffered by plaintiffs is due to the failure to deliver to Rosanova. Even if Booth's representations had been true, the failure of Sagittarius to deliver would still have caused plaintiffs to lose the ITC and the benefit of the contract. Thus, Booth argues that its acts or omissions were not the proximate cause of plaintiffs' harm. Rose concurs in this defense.

■ While many of the circumstances of the lease are disputed by the parties, it is clear that the triggering event in this lawsuit was the failure of AVI or Sagittarius to deliver the masters to Rosanova. Where there is no dispute about causal connection, causation becomes a question of law for the court. *Davis v. Thornton*, 384 Mich. 138, 145, 180 N.W.2d 11 (1970). Proximate cause is "essentially a problem of law." *Moning v. Alfono*, 400 Mich. 425, 440, 254 N.W.2d 759 (1977); Prosser, *supra*, § 42, at 273. The analysis that follows convinces me that Booth's representations clearly were not the proximate cause of plaintiffs' harm. Booth has shown that there is no genuine issue of material fact as to the claim for fraudulent misrepresentation and

that Booth is entitled to judgment on this cause of action as a matter of law.

b.

The test for whether Booth's misrepresentations were the proximate cause of plaintiffs' harm is whether their loss of the ITC and benefit of the contract "grew out of the very subject-matter of the fraud.... [and] was within the contemplation of the parties" *Rosenblatt, supra,* at 515–16, 247 N.W. 733. Here, the subject matter of the alleged fraud went to Booth's representations that plaintiffs could take an ITC for leasing the masters and that they would obtain legal title to the masters along with substantially all copyright privileges. Even if Booth knowingly misrepresented the nature of the ITC benefits, legal title and copyrights, it was AVI or Sagittarius's failure to deliver the masters to Rosanova that prevented plaintiffs form getting those benefits. Booth did not represent as part of its tax opinion that Sagittarius would deliver the masters before any certain date. Thus, Booth's representations could be the proximate cause only if it knew that the masters would not exist before the end of 1981, or that AVI would not deliver the masters to Sagittarius. This would be akin to the warehouseman in *Rosenblatt*, who did not start the fire but nonetheless assured that a fire could not occur. In other words, it would be necessary that, although Booth was not responsible for the failure to deliver, it had nonetheless assured that plaintiffs would obtain legal title and possession when in fact it knew that such would not be likely to occur. My examination of the record, as explained *infra*, convinces me that there simply is insufficient evidence in the record that would allow an inference that Booth participated in a fraud as to title and delivery.

Paragraph 5 of plaintiffs' Supplemental Response says that the masters always remained in the possession, custody, and control of AVI. This fails to help plaintiffs, since it merely restates the obvious, *i.e.,* that Sagittarius failed to deliver the mas-

ters to Rosanova. The documents supporting this paragraph (Zeiger Dep., p. 63; Whalen Dep., p. 169) do not show that Booth knew before June 25, 1981 that AVI never intended to deliver to plaintiffs' chosen manufacturer/distributor. Indeed, these do not even constitute evidence of AVI's intent to breach, regardless of what Booth's knowledge might have been. They merely state the nature of AVI's operations, *i.e.*, that AVI holds its masters until such time as it bails them to a qualified manufacturer/distributor. *See* Lease, Art. 15. Paragraph 24 of the Supplemental Response says that AVI refused to release the masters to Rosanova unless plaintiffs executed a distribution agreement with an AVI affiliate. But any dispute between the parties here as to what constitutes a qualified manufacturer/distributor is irrelevant unless Booth knew that AVI would not release the masters to any manufacturer/distributor that plaintiffs possibly could have chosen. There is no such evidence in the record. That Booth knew AVI would keep the masters in the interim is not evidence that it knew of a plan not to deliver.

Paragraph 8 of the Supplemental Response states that Booth met with Sagittarius representatives for more than ten hours before issuing its 1981 tax opinion. From this, plaintiffs would infer that Booth must have known of an intent not to deliver. While such discussions may raise a suspicion that Booth knew of such an intent, suspicion is not enough. "The party opposing the motion must place a material fact in issue by presenting facts of a substantial nature; it is not sufficient to rely on conclusions of law or mere suspicions." *Invictus Records v. American Broadcasting Companies*, 98 F.R.D. 419, 426 (E.D.Mich. 1982).

Paragraphs 10 and 14 of the Supplemental Response document Booth's concern as to Sagittarius's unreliability and indicate that Booth suspected its tax opinion might be litigated. Similarly, the purpose of paragraph 13 seems to be to suggest that Booth should have been concerned as to whether the 1981 master leasing program could safely be characterized as a "non-security" under the securities laws. Para-

graph 21 suggests that Booth should have known the 1981 program would not give plaintiffs an ITC on their tax returns. These "due diligence" concerns would be relevant only if I were here concerned with whether Booth harmed plaintiffs by misleading them as to the ITC, or whether Booth improperly characterized the master leasing program as a "non-security." But these issues are made causally irrelevant by the failure to deliver the masters in the first place, which is the proximate cause of plaintiffs' harm. Booth's concern over future litigation does not allow an inference that Booth knew AVI or Sagittarius intended to breach by failing to deliver the masters to any or all manufacturers plaintiffs might have chosen.

To the contrary, some of the documents offered by plaintiffs suggest Booth expected the masters to be released to some manufacturer/distributor on behalf of plaintiffs. A January 28, 1981 memo (Exhibit D to the Supplemental Response) by the law firm of Bragar, Spiegel, Schulman, Rubin & Driggin—which wrote an opinion as to the 1980 program—was supposedly seen by Booth. Whether or not the 1981 program would qualify as a "non-security," the memo suggests at the least that there was an expectation that the masters would be delivered to some manufacturer/distributor for the benefit of the plaintiffs.

Similarly, a Booth memo dated May 8, 1981 (Exhibit G to the Supplemental Response) suggests that Booth expected AVI to deliver the masters to a qualified manufacturer/distributor selected by plaintiffs, including any masters that might not have been in existence at the time the contract was executed. The document, the product of conversations with Sagittarius, does not suggest that Booth was put on notice of any preconceived plan to breach. Indeed, it suggests quite to the contrary. This is reinforced by the deposition testimony of one of Booth's lawyers who worked on the 1981 opinion letter, Jay Zeiger, who said: "[W]e would not have permitted any of our clients to continue to offer an interest in a transaction without the transaction con-

firming [sic] to the 1981 Tax Act...." (Zieger Dep., p. 55.)

To the extent Booth displayed concern over potential problems with Sagittarius's leasing programs in 1981 and before, this does not suggest that Booth was trying to cover up for its client, but rather that it wanted to assure the program would be properly managed so as to reduce its own potential liability. Plaintiffs' undocumented allegation tht Booth drafted its 1981 opinion letter despite knowledge that AVI or Sagittarius would not deliver the masters—a major event that could have been expected to, and in fact did, trigger the instant litigation—flies in the face of Booth's documented concern that Sagittarius's leasing program might be inadequate in more subtle ways, related instead to the tax and security aspects of the program.

■ Loss from the failure of Sagittarius to deliver was simply not within the contemplation of the parties, as required by *Rosenblatt.* "Where there are no issues of fact left for the trier of fact to determine, the moving party has a right to judgment even if intent and motive are involved." *Invictus, supra.* Plaintiffs have presented only suspicions and no substantial facts as to the material issue here. Thus, there is no proximate cause as to Booth, since the harm flows from Sagittarius's intervening act in failing to deliver to Rosanova.

c.

■ Plaintiffs fail to understand the difference between "transaction causation" and "loss causation." Plaintiffs must show loss causation. *See Cable v. Hechler,* 532 F.Supp. 239, 244 (E.D.N.Y.1981). While Booth's representations may have caused plaintiffs to enter into the lease contract with Sagittarius—transaction causation—it is Sagittarius's failure to deliver that

harmed plaintiffs—loss causation. Numerous cases in Michigan support Booth on this point. *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 358 F.Supp. 449, 462–63 (E.D.Mich.1972), *aff'd,* 509 F.2d 1043 (6th Cir.1975); *Mosher v. Sawyer-Weber Tool Mfg. Co.,* 224 Mich. 303, 194 N.W. 979 (1923); *Gethchell v. Dusenbury,* 145 Mich. 197, 202, 108 N.W. 723 (1906). Decisions from other jurisdictions also support Booth on similar facts. *Boatmen's Nat. Co. v. M.W. Elkins & Co.,* 63 F.2d 214 (8th Cir. 1933); *Altschuler v. Cohen,* 471 F.Supp. 1372 (S.D.Tex.1979); *Hickman v. Groesbeck,* 389 F.Supp. 769 (D.C.Utah 1974).[1]

### 2. Innocent Misrepresentation Claim

Booth lays out the five elements for a claim of innocent misrepresentation in Michigan: "[W]here an action is brought to recover for false and fraudulent misrepresentations made by one party to another [1] in a transaction between them, [2] any representations which are false in fact [3] and actually deceive the other, and [4] are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, [5] where the loss of the party deceived inures to the benefit of the other." *See U.S. Fidelity & Guaranty v. Black,* 412 Mich. 99, 116, 313 N.W.2d 77 (1981), quoting with approval from 37 Am.Jur.2d, *Fraud & Deceit* § 195. For purposes of this motion, Booth concedes all the elements except the requirements that the misrepresentations have been made in a transaction between the parties, *Rosenberg v. Cyrowski,* 227 Mich. 508, 511, 198 N.W. 905 (1924); *Aldrich v. Scribner,* 154 Mich. 23, 30, 117 N.W. 581 (1908), and that plaintiffs' loss inured to the benefit of Booth, *United States Fidelity & Guaranty v. Black,* 412 Mich. 99, 116, 118, 313 N.W.2d

**1.** Booth further notes that plaintiffs must show injury to win on a fraud claim. *Mallick v. Migut,* 22 Mich.App. 140, 143–44, 177 N.W.2d 200 (1970). Booth argues that plaintiffs have not sustained any injury from the misrepresentations since the harm has been rectified by the provision of a consent judgment whereby Sagittarius returned to plaintiffs all monies paid on the lease. Thus, there is no reliance damage.

Plaintiffs also claim that they lost expected profits. Booth properly points out that no recovery is allowed where loss of profits is speculative and conjectural, *Talcott v. Crippen,* 52 Mich. 633, 18 N.W. 392 (1884), particularly where the business has not yet begun operation, *Serbinoff v. Dukas,* 348 Mich. 69, footnote at 76, 81 N.W.2d 236 (1957). Thus, there is no compensable injury to plaintiffs.

77 (1981); *Riddle v. Lacey & Jones,* 135 Mich.App. 241, 245–46, 351 N.W.2d 916 (1984). Thus, these are the only material contested issues on this claim.

Booth argues first that plaintiffs have failed completely to even properly plead this cause of action because the Amended Complaint does not allege privity of contract or that plaintiffs' loss inured to Booth's benefit. This is true. In fact, the innocent misrepresentation claim did not appear until plaintiffs' "Anticipated Contested Legal Issues," filed April 15, 1985. Plaintiffs are trying to amend their complaint a second time without having properly moved to amend to add this cause of action. Thus, this claim could be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Rule 12(b)(6) also provides that such a defense may be disposed of as one for summary judgment under Rule 56.

■ Booth further argues the elements of the claim as if properly pleaded by plaintiffs. First, because plaintiffs' contract was with Sagittarius, not Booth, Booth argues that plaintiffs cannot show the requisite privity between the parties. Privity must proceed from the will of the parties. *Woods v. Ayres,* 39 Mich. 345 (1878). Booth was not a party to the lease contract, nor do Plaintiffs show that Booth intended to be in privity with plaintiffs. Thus, Booth shows there is no dispute over this material fact.

■ Second, Booth argues that it received no benefit from plaintiffs' loss. Booth cites *Rosenberg* and *Riddle, supra,* both cases where attorneys, involved with the opposing party, innocently misled plaintiffs. Both cases held that the plaintiff could not recover against the attorney because the latter did not benefit. This is true even if the attorney received a fee. *Riddle,* at 246, 351 N.W.2d 916. While Booth here did have a written retainer agreement with Sagittarius that provided a $10,000 bonus if leases entered into by

Sagittarius amounted to $1.75 million or more, there is no dispute that this was to have been effective for only the 1982 leasing program. Since this case involves only the 1980 and 1981 opinion letters, the 1982 bonus program is not material. Plaintiffs allege no other benefit that Booth received. Booth has shown that there is no genuine dispute as to all material issues, and is thus entitled to summary judgment.[2]

### III. Rose's Motion for Summary Judgment

Because Booth's motion for summary judgment is granted, the third-party claim against Rose falls, and it is unnecessary to consider Rose's motion for summary judgment.

---

**2.** Judge Jon O. Newman of the Court of Appeals for the Second Circuit has recently commented that the rules regarding summary judgment have usually been applied too rigidly to meritless cases like this, with the result that such cases clog up dockets and deny fairness to other litigants. *See* J. Newman, *Rethinking Fairness: Perspectives on the Litigation Process,* 94 Yale L.J. 1643, 1650–52 (1985).