Jerry ACKERMAN, et al., Plaintiffs,

v.

Howard SCHWARTZ, et al., Defendants.

No. S85–705.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 29, 1989.

Robert W. Mysliwiec, South Bend, Ind., for plaintiffs.

William J. Reinke, Paul E. Becher and Ernest J. Szarwark, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

On August 30, 1983, attorney Howard Schwartz wrote an opinion letter concerning a leasing program purportedly involving the production of ethanol. The leasing program collapsed due, at least in part, to its principals' criminal conduct. Nearly one hundred persons who invested in that

program, and who claim to have relied upon the opinion letter in doing so, seek to hold Mr. Schwartz and his law firm liable under federal securities and racketeering laws, Indiana securities and racketeering laws, and Indiana's common law.

The cause is before the court on the defendants' motion for partial summary judgment under Fed.R.Civ.P. 56. In responding to the defendants' motion, the plaintiffs have submitted the affidavit of Glen Scolnik, an attorney whose opinion the plaintiffs offer as expert testimony in support of their attorney malpractice and federal securities claims; the defendants' motion to strike that affidavit also pends before the court. Resolution of these motions has been delayed by the necessity to review briefs in excess of 225 pages, as well as two volumes of exhibits directed to the defendants' multiple attacks upon the plaintiffs' five independent theories, and several sub-theories, of liability. The court has completed that review and, after thorough consideration, concludes that the motion to strike should be denied and the summary judgment motion should be granted.

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). Should that showing be made in a case in which the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145 (7th Cir.1989); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Gomez v. Chody*, 867 F.2d 395 (7th Cir.1989); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656 (7th Cir.), *cert. denied* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Summary judgment

should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Schroeder v. Copley Newspaper*, 879 F.2d 266, 269 (7th Cir.1989); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

The parties cannot rest on mere allegations in the pleadings, *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1148 (7th Cir.1989); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 931 (7th Cir.1989), or upon conclusory allegations in affidavits. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989). The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313 (7th Cir.1987), as long as the inferences are reasonable. *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir.1989); *Mays v. Chicago Sun-Times*, 865 F.2d 134, 136 (7th Cir.1989). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir.1989).

With these standards in mind, the court turns to the facts disclosed by the parties' submissions, drawing all reasonable inferences in favor of the plaintiffs, the non-moving parties.

## I. FACTS

For purpose of the partial summary judgment motion, the plaintiffs are individuals who invested in an equipment leasing program, devised by Gary VanWaeyenberghe and Carl Leibowitz, which was designed to be a "year-end" tax shelter for the year 1983. The investment proved to be worthless for reasons the parties dispute. In addition to the loss of their initial investment, many of the plaintiffs were assessed penalties and interest by the In-

ternal Revenue Service for unpaid taxes and overvaluation of the equipment. The defendants are attorney Howard K. Schwartz and his law firm, Bassey, Selesko & Couzens, P.C., who prepared an opinion letter concerning the program.

### A. The Leasing Program

The leasing program involved at least four corporate entities:

*1. Multi–Equipment Leasing Corporation* ("MEL") was set up to act as the principal lessor and was incorporated on August 18, 1983 in the State of Indiana. Although VanWaeyenberghe and/or Leibowitz actually controlled MEL, Robert Milligan was recruited to act as its nominal president, sole stockholder, and director. All business and financial affairs, however, were conducted or directed by VanWaeyenberghe or Leibowitz.

*2. S & H Manufacturing Company, Inc.* ("S & H Manufacturing") was chosen as the ultimate manufacturer of the equipment. Larry Slabaugh owned and operated S & H Manufacturing, which was engaged in the manufacture of farm equipment before August, 1983.

*3. Good–Wrench Industries, Inc.* ("Goodwrench") was the third corporate entity involved in the program. To protect the integrity of S & H Manufacturing, Mr. Slabaugh established Goodwrench to act as a general contractor. Goodwrench was incorporated on August 15, 1983 with Larry Slabaugh as its president and sole stockholder. There were no other employees and no assets beyond the initial $1,000.00 minimum capitalization requirement.

*4. Organized Producers Energy Corporation* ("OPEC") was the final link, supplied by VanWaeyenberghe and Leibowitz, who served as officers. OPEC purportedly was in the business of constructing, acquiring, and managing the operation of ethanol plants. From the inception of MEL, OPEC was intended to act as the ultimate sublessee of the ethanol equipment, although the investors purportedly had the option of subleasing their unit of equipment to any ethanol manufacturer.

The leasing program was designed to work as follows: each investor would make an initial investment of $10,000.00 which would constitute "prepaid rent" for each unit of equipment for a period of five years. MEL, acting as the lessor, would order the equipment from Goodwrench, which, in turn, would subcontract the manufacturing work to S & H Manufacturing at a cost to Goodwrench of approximately $5,000.00 per unit. For each unit actually produced, Mr. Slabaugh tacked on a 5% "sales commission" and invoiced it through another of his business entities, Slabaugh Sales & Service. Goodwrench then would sell the units of equipment to MEL at the greatly inflated price of $100,000.00 per unit, 10% of which was to be paid in cash as a down payment, with the balance of $90,-000.00 represented by a full-recourse, fourteen year promissory note from MEL to Goodwrench.

Upon receipt of the equipment, MEL would deliver it to OPEC, the intended sublessee, for incorporation into an ethanol manufacturing facility. In return for their investment, investors were to receive a percentage of the profits from the ethanol manufacturing operation, a 100% write-off of their initial investment in the form of an ordinary and necessary business expense deduction when the $10,000.00 rental payment was prorated over the lease's term, and an investment and energy tax credit for the year 1983 in the total amount of $20,000.00 based on the purchase price paid by MEL ($100,000.00).

### B. The Opinion Letter

VanWaeyenberghe and Leibowitz needed an attorney's opinion letter to market the 1983 leasing program effectively. They turned to defendant Howard Schwartz, an attorney and social acquaintance of Leibowitz. Mr. Leibowitz first contacted Mr. Schwartz about drafting the opinion for MEL in July, 1983. A formal agreement was reached in late August, 1983 by which VanWaeyenberghe and Leibowitz retained the defendant law firm and Mr. Schwartz, a partner in the firm, to prepare the opin-

ion, outlining the federal tax aspects of the lease transaction. Mr. Schwartz and his firm received a fee of $5,000.00 for their services.

Although Mr. Schwartz was principally responsible for the letter and signed it on the firm's behalf, Robert Clemente, an associate with the firm, actually drafted the letter under Mr. Schwartz's direction and supervision. Mr. Clemente attests that all of the letter's factual representations came from Mr. Schwartz and an undisclosed party, and that in response to his repeated inquiries regarding the need for verification of the representations, Mr. Schwartz indicated that the facts either had been, or would be, verified by him personally. Mr. Schwartz disagrees; he maintains that it was Clemente's responsibility to comply with whatever "due diligence" requirements were applicable in drafting the letter.

The opinion letter was issued on August 30, 1983 and was addressed to MEL's Board of Directors. It contained no limitation with respect to dissemination and did not identify the source of the factual representations contained therein, but indicated that the representations had been assumed to be true and accurate and included a disclaimer to the effect that the defendants had made no attempt to verify the various representations independently. The defendants, however, expressly represented that their opinion letter was prepared "in a manner that ... complies with the requirements of both the proposed Treasury Regulation [Treas.Reg. 230] and Formal Opinion 346 [of the American Bar Association]." Both Treasury Reg. 230 and Formal Opinion 346 relate to the scope and content of legal opinions provided by attorneys in connection with tax shelter investments.

In issuing the opinion letter to MEL, Mr. Schwartz allegedly relied upon and incorporated certain factual representations that had been made by either VanWaeyenberghe or Leibowitz to the effect that:

1. Goodwrench was in the business of manufacturing ethanol equipment.

2. Any sublessee would be a validly organized and existing corporation in the business of operating ethanol plants and selling the products therefrom at levels intended to be profitable.

3. Goodwrench, MEL, and any sublessee (*i.e.*, OPEC), the owners, directors, and officers thereof, would be unrelated and unaffiliated, both directly and indirectly.

4. The equipment's fair market value would not be less than its purchase price (the price paid by MEL).

5. MEL would pass through to the lessee all of the available tax credits based upon MEL's acquisition cost of the equipment.

6. MEL would have no controlling ownership interest or controlling financial interest in Goodwrench or any potential sublessee ethanol plant operator, and there would be no interlocking directorships, common officers, joint ventures, licensing, or financing arrangements of any kind.

7. All transactions between the various parties would be independently negotiated at arm's length.

8. There would be no underlying understandings, commitments, or agreements other than those expressed in the proposed and previously identified documents (i.e., the lease agreement between MEL and individual investors, and the contract between MEL and Goodwrench).

9. The equipment has been acquired with a view toward economic profit for both MEL and the lessee, which profit is in addition to, or apart from, any anticipated tax credits.

Based on those representations, Mr. Schwartz and his firm expressed opinions that:

(1) the IRS would allow investors to deduct, on a prorated basis, 100% of their investment as an ordinary and necessary business expense;

(2) MEL would be able to pass-through, and investors would be able to claim, an investment and energy tax credit based upon MEL's acquisition cost ($100,000.00), which they represented

should be the fair market value of the equipment;

(3) the equipment would be deemed "placed in service" for tax purposes in the year in which MEL transferred possession to the lessee;

(4) investors could claim both a business deduction and the tax credits in that taxable year, presumably 1983; and

(5) the IRS would have no basis for challenging these conclusions, and if it did, the courts would more than likely reject such a challenge.

The plaintiffs maintain, and the defendants generally do not dispute, that Van-Waeyenberghe's and Leibowitz's factual representations, perpetuated in the opinion letter, were false. When the letter was issued, neither Goodwrench nor S & H Manufacturing was in the business of manufacturing ethanol equipment and there were no existing and operational ethanol plants under OPEC's management and control. Goodwrench, S & H Manufacturing, MEL, OPEC, and the individuals who controlled those organizations were all interrelated, either directly or indirectly. MEL's "acquisition cost" was not reflective of the equipment's fair market value or, for that matter, of its true cost of acquisition. MEL and, more specifically, VanWaeyenberghe and Leibowitz, the two individuals who actually controlled MEL, had a controlling interest in OPEC, the intended sublessee. The transactions between MEL and Goodwrench, Goodwrench and S & H Manufacturing, and OPEC and the plaintiffs were not independently negotiated at arm's length, but involved significant self-dealing.

### C. The Program's Collapse and the Defendants' Knowledge

Most of the funds invested in the 1983 MEL leasing program were diverted to VanWaeyenberghe and Leibowitz for their personal benefit. With the exception of twenty stills, the equipment was never manufactured, presumably because there was no money to pay for it. The twenty stills that were manufactured were never incorporated into an operational ethanol

manufacturing facility because OPEC did not own or manage such a facility or have one under construction in 1983. Those plaintiff-investors who took the deduction and investment and energy tax credits on their 1983 tax returns were notified by the IRS that those deductions and credits would be disallowed, that they would be required to repay any refund that had been issued as a result of the disallowed deductions and credits, and that they would be assessed penalties and interest on their unpaid tax liability and/or for the over-valuation of the equipment.

Mr. Schwartz and his firm argue that their involvement in the 1983 leasing program began and ended with the opinion letter. The plaintiffs, however, have come forth with evidence from which a jury could find otherwise. The jury could find that Mr. Schwartz continued his representation of MEL, VanWaeyenberghe and Leibowitz throughout the remainder of 1983 and 1984. A jury also could find that Mr. Schwartz became aware of the investment's futility as early as November, 1983, yet took no steps until August, 1984 either to withdraw his opinion or to advise investors that the equipment would not be manufactured and placed in service as promised.

On August 9, 1984, Mr. Schwartz drafted a letter on MEL's behalf, for dissemination to investors, that stated that due to circumstances beyond MEL's control the equipment had not been manufactured. The notice came far too late to benefit any of the plaintiffs. Throughout 1984, Mr. Schwartz represented MEL, VanWaeyenberghe, and Leibowitz in IRS and the Securities Commission investigations regarding the 1983 leasing program. Mr. Schwartz also negotiated substantial loans from MEL to corporate entities with which he was associated, specifically Michigan Peninsular Airways and the International Communications Limited Partnership. MEL retained Mr. Schwartz and his firm to provide legal services in defense of the tax shelter leasing program and received a retainer fee for those proposed services.

In the fall of 1984, Mr. Schwartz drafted additional legal opinions in support of a partnership offering for Ethanol Producers Limited Partnership, another investment scheme devised by VanWaeyenberghe and Leibowitz. Four such limited partnerships were offered, with each to purchase an entire ethanol facility from OPEC. Investors in the 1983 MEL equipment leasing program were invited to roll-over their investment into one of the limited partnerships.

### D. The Amended Complaint and The Summary Judgment Motion

The plaintiffs allege in their amended complaint that the defendants knowingly or recklessly misrepresented or omitted material facts in their 1983 opinion letter on which the plaintiffs relied in making their investment decisions, that they were damaged when the investment proved to be worthless, and that the defendants' actions or inactions caused or significantly contributed to those injuries. The plaintiffs assert an attorney malpractice/negligence claim against the defendants and also allege that the defendants aided and abetted VanWaeyenberghe and Leibowitz in violating Sections 12(1) and (2) of the Securities Act of 1933, 15 U.S.C. § 77l(1) and (2); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(b); the Indiana Securities Act, IND.CODE 23–2–1–12; and the Indiana RICO statute, IND.CODE 35–45–6–1 and 2. Although the amended complaint alleges only negligence on the part of the defendants with respect to their involvement in the 1984 limited partnership offering, the plaintiffs maintain on summary judgment that the defendants intentionally misrepresented and omitted material facts in connection with the sale of the limited partnerships.

The defendants have moved for summary judgment on all counts of the complaint to the extent they arise out of investments in the 1983 MEL equipment leasing program. Several of the plaintiffs, however, have claims arising out of their investment in the 1984 Ethanol Producers Limited Partnership, these claims are unaffected by the summary judgment motion and remain viable.[1]

## II. CAUSATION GENERALLY

■ One issue recurs in the defendants' motion with respect to each of the plaintiffs' claims: whether any negligent or reckless act or omission on the part of Mr. Schwartz or his firm proximately caused the plaintiffs' injuries. The defendants contend that the plaintiffs' injuries were proximately caused by the diversion of funds from MEL by VanWaeyenberghe and Leibowitz for their own personal use and not by misrepresentations or omissions that may have been made in the 1983 opinion letter, and that it was not foreseeable when they issued their opinion letter that money would be diverted or that equipment would not be produced and placed in service by the end of 1983.

The plaintiffs take the position that it is the foreseeability of the injury that determines whether the defendants' conduct can be found to be the proximate cause of the injuries alleged. They argue that even absent the diversion of funds by VanWaeyenberghe and Leibowitz, they would have suffered the same losses, which they maintain are directly attributable to the misrepresentations or omissions in the opinion letter (such as (a) the equipment's value, (b) when the equipment would be deemed "placed in service" for tax purposes, (c) the availability and amount of the investment and energy tax credits, and (d) the applicability of the non-corporate lessor rule), and to the defendants' failure to revoke the opinion letter.

---

1. Plaintiffs John and Helen Buschkamp, George McAttee, and Betty and Robert Roney purportedly invested only in the 1984 partnership; their claims with respect thereto are unaffected. Plaintiffs Aaron Miller, James Miller, Alan Pet-ersen, and George Shoemate invested in both the 1983 leasing program and the 1984 partnership. The summary judgment motion applies only to those claims arising out of their 1983 investments.

Were the court to accept the defendants' argument, no further discussion would be required; causation is an essential element of each of the plaintiffs' claims. The court, however, must reject the defendants' invitation to hold, as a matter of law, that the diversion of funds was an unforeseeable intervening and superceding cause of the plaintiffs' injuries.

■ When an "intervening" force brings about a result that a defendant's negligence would not otherwise have produced, the defendant generally will be held liable for that result only where the intervening force was foreseeable. W. Keeton, *Prosser and Keeton on Torts* § 44, at 302 (5th ed.1984); *Restatement (Second) of Torts* § 440 (1965). While criminal conduct by others may not always be foreseeable, *see, i.e., First Interstate Bank of Nevada, N.A. v. Chapman & Cutler*, 837 F.2d 775, 779–80 (7th Cir.1988) ("theft of corporate funds by officers was hardly a reasonably foreseeable result"), the court cannot hold as a matter of law that such conduct was unforeseeable in this case. The plaintiffs have presented evidence that tends to show that, even absent the diversion of funds, misrepresentations by Mr. Schwartz and his firm as to the MEL investment's tax consequences would have produced the same result: the loss of the investment and tax credits and the assessment of penalties by the IRS for over-valuation of the equipment.

Contrary to the defendants' position, foreseeability does not mean that the precise hazard or the exact consequences that were encountered should have been foreseen. Rather, the focus should be on the general class of risks or victims involved. The securities laws were designed to control practices that "smack of fraud", *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1050 (7th Cir.), *cert. denied* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), and to provide a remedy for harmed purchasers of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975); *see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,

754 F.2d 57, 62 n. 4, 63 (2d Cir.1985) (suggesting that loss causation may exist with respect to the purchasers of the securities where the legal firm's faithful exercise of its fiduciary duty could have prevented harm to the purchasers). A reasonable jury could infer, given the nature and extent of the misrepresentations made by VanWaeyenberghe and Leibowitz and perpetuated in the defendants' opinion letter, that the 1983 leasing program was designed to effect an improper or fraudulent purpose.

The plaintiffs can establish a sufficient causal link between the misrepresentations or omissions in the opinion letter and the claimed losses if they can show that the subject of some of the alleged misrepresentations or omissions might have been relevant to the loss. *See Pasternak v. Sagittarius Recording Co.*, 617 F.Supp. 1514, 1518 (E.D.Mich.1985), *aff'd* 816 F.2d 681 (6th Cir.1987); *Bastian v. Petren Resources Corp.*, 681 F.Supp. 530, 533–34 (N.D.Ill.1988). The plaintiffs have come forth with evidence sufficient to allow a reasonable jury to find that while the defendants may not have known about or been responsible for the diversion of funds by VanWaeyenberghe and Leibowitz when they issued their opinion, they either knew or reasonably should have foreseen that:

 –the fair market value of each item of equipment was substantially below $100,-000.00,

 –the equipment could not be "placed in service" by the end of 1983 within the meaning of the Internal Revenue Code, and

 –the non-corporate lessor rule would apply to the plaintiffs, and that the IRS would challenge the transaction.

This would constitute a sufficient causal link between the misrepresentations and omissions in the opinion letter and the losses suffered. Whether these consequences were known to, or foreseeable by, the defendants at the time they issued the August 30, 1983 opinion letter presents a genuine issue of material fact foreclosing summary judgment on causation grounds. *See*

*Pasternak v. Sagittarius Recording Co.,* 617 F.Supp. at 1518.

## III. COUNT I: ATTORNEY MALPRACTICE

Count I of the amended complaint alleges that the defendants were negligent in the preparation and issuance of the August 30, 1983 opinion letter. The defendants maintain that the plaintiffs have established neither the existence of a duty owed to the plaintiffs nor that any breach of that alleged duty caused the plaintiffs' injuries. Having previously addressed the causation issue, the court turns to the question of duty.

Mr. Schwartz and his firm contend that under Indiana law, in the absence of privity, a professional must have had actual knowledge that the particular person bringing the suit would rely on the information given by the professional. The investors argue that a different standard governs attorneys dealing with securities. Further, they argue that under the agreement between MEL and Mr. Schwartz's law firm, the plaintiffs either stand in privity with the law firm or are third-party beneficiaries of the agreement. The plaintiffs also argue that Michigan law governs the issuance of the opinion letter, and that Michigan law imposes a duty to a wider range of persons than does Indiana law. Finally, the plaintiffs argue that Mr. Schwartz and his firm undertook a duty to the investors within the meaning of Michigan law.

### A. Choice of Laws

■ The court's task is complicated by the parties' apparent disagreement concerning the law to be applied. While Mr. Schwartz and his firm cite to Indiana cases, the investor-plaintiffs rely on cases from other jurisdictions, then focus on Michigan law. Further, the parties offer little argument as to which law should govern the state law claims. Resolution of the summary judgment motion on the state law claim requires resolution of the choice of law issue, however; the court cannot determine whether the plaintiffs have come forth with sufficient evidence to support a state law claim without determining which state's law would govern the claim.

This court must apply the choice-of-laws rules of the state in which the court sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1943). The Indiana Supreme Court recently modified Indiana's choice of laws rules in tort cases in *Hubbard Manufacturing Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987). *See also Gollnick v. Gollnick,* 539 N.E.2d 3 (Ind.1989); *Tompkins v. Isbell,* 543 N.E.2d 680 (Ind.App.1989). The *Hubbard Manufacturing* court rejected Indiana's former, pure *lex loci delicti* test in favor of a modified "most significant contacts" test which applies when the place of the tort is an insignificant contact. Determining the place of the tort would be challenging in this case [2]: the opinion letter was issued in Michigan and dispatched to Indiana, from which it apparently was sent to investors in numerous states, who relied on it in claiming tax benefits ultimately disallowed (perhaps in the District of Columbia). It cannot be said with confidence where "the last act necessary to make an actor liable for the alleged wrong" occurred. *Hubbard Manufacturing Co., Inc. v. Greeson,* 515 N.E.2d at 1073.

Accordingly, the court turns to the additional factors set forth in *Hubbard Manufacturing:* where the conduct causing the injury occurred; the parties' residence or place of business; and the place where the relationship is centered. 515 N.E.2d at 1073–1074. The conduct causing the injury occurred in Michigan and Indiana: Mr. Schwartz and his firm prepared the letter in Michigan, and the letter was disseminated from Indiana. The parties' residences stretch throughout the nation. The parties' relationship was centered in Indiana, where all of the corporations involved in the investment scheme were located and where the securities that were the subject

---

2. The plaintiffs, however, in opposing the defendants' motion to dismiss or transfer, took the position that, "Certainly the claim arose in the Northern District of Indiana." (Plaintiffs' Response to Defendants' Motion to Dismiss or Transfer, filed May 21, 1986, at 10).

of the opinion letter were required to be registered. Analysis under *Hubbard Manufacturing* leads to the conclusion that Indiana has the most significant contacts.

This conclusion is underscored by the plaintiffs' claims in this case based on Indiana's RICO statute and securities laws. To apply those Indiana statutes to the defendants' conduct, while applying Michigan negligence law to the same conduct, would seem incongruous. Accordingly, the court concludes that Indiana law governs Count I of the plaintiff's amended complaint.

### B. Attorneys' Duty to Non–Privies Under Indiana Law

 To establish liability for negligence under Indiana law, a plaintiff must show a duty owed to the plaintiff, a breach of that duty, and injuries which were proximately caused by the breach. *Bridgewater v. Economy Engineering Co*, 486 N.E.2d 484, 489 (Ind.1985). As noted above, the defendants argue that they owed the plaintiffs no duty under Indiana law.

Mr. Schwartz attests that he did not know, authorize, or anticipate that the opinion letter would be disseminated directly to potential investors in the program and to the plaintiffs in particular. He obviously makes a distinction, however, between direct and indirect dissemination, for he further attests that he anticipated that the opinion letter "might be distributed to attorneys, accountants and other tax advisors". It is certainly arguable that it was reasonably foreseeable that such individuals would pass on the information to potential investors. *See, e.g., Hickman v. Groesbeck*, 389 F.Supp. 769, 779 n. 20 (D.Utah 1974) (although plaintiffs had own advisors review information concerning proposed venture, reliance could still be found since advisors could have also relied on alleged misrepresentations). Under present Indiana law, however, an attorney owes no duty to non-privies whose identities are unknown at the time of the allegedly negligent misrepresentation, even if future reliance by such persons is reasonably foreseeable.

In *Essex v. Ryan*, 446 N.E.2d 368 (Ind. App.1983), the court considered the liability of a surveyor whose negligently prepared survey was relied upon by persons other than his clients. The Indiana Court of Appeals rejected a theory of liability based on section 552 of the *Restatement (Second) of Torts* in favor of Justice Cardozo's approach in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), and held that the surveyor had no liability to subsequent purchasers who relied upon his survey "because he had no knowledge they would rely upon his survey and because he was not in privity with them." 446 N.E.2d at 374. The court expressed its belief that "the privity requirement, subject to an actual knowledge exception, properly balances the competing interests of consumer and professional in a case such as the one before us."

The Seventh Circuit acknowledged the Indiana approach to professional negligence in *Toro Co. v. Krouse, Kern & Co., Inc.*, 827 F.2d 155 (7th Cir.1987), a case involving a claim of accountants' liability to a lender that relied upon reports made to the accountants' client. The court found that the accountants owed no duty to the lender under Indiana law. The court explained that under *Essex* Indiana recognizes a narrow "actual knowledge" exception to the requirement of privity, applicable only when the plaintiff proves that the defendant had actual knowledge that the particular person or entity bringing the law suit would rely on the information given. 827 F.2d at 161.

The *Toro* court further reasoned that since the *Essex* holding was based on *Ultramares*, Indiana law would follow the New York Court of Appeals' more recent reaffirmation of the *Ultramares* "privity or near privity" requirement as set forth in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). The *Credit Alliance* court found three requirements to exist for accountants to be liable to a third party:

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or pur-

poses; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

493 N.Y.S.2d at 443, 483 N.E.2d at 118. The *Toro* court described the third requirement, upon which the *Toro* plaintiff stumbled, as "quite obviously meant to ensure there was 'an affirmative assumption of a duty of care to a specific party, for a specific purpose.'" 827 F.2d at 161.

The *Essex* rule found application in the context of an attorney in *Walker v. Lawson*, 514 N.E.2d 629 (Ind.App.1987). In *Walker*, an attorney had prepared a will leaving the entire estate to the testator's two sons; after the testator's death, the testator's surviving spouse elected to take against the will, taking one-third of the estate. One son brought a negligence action against the attorney. The court of appeals held that the attorney owed an enforceable duty to the known beneficiary. The court explained that its holding

> ... does not mean a lawyer is liable to the entire world for professional incompetence (*see Essex, supra*), but it does mean that in the narrow circumstances of this case, ordinary principles of negligence apply to create a cause of action for malpractice for the known intended beneficiaries of a testamentary scheme.

514 N.E.2d at 634. On transfer, the Indiana Supreme Court reversed the court of appeals on other grounds, but agreed "that an action will lie by a beneficiary under a will against the attorney who drafted that will on the basis that the beneficiary is a known third party." *Walker v. Lawson*, 526 N.E.2d 968 (Ind.1988).

In the only other recent reported Indiana decision concerning an attorney's liability to a third party, *Hermann v. Frey*, 537 N.E.2d 529 (Ind.App.1989), an attorney was found to owe a duty, under the principles of *Walker v. Lawson*, to a woman who (1) had retained the attorney to represent her husband's estate in a medical malpractice suit, (2) was her husband's only surviving heir, and (3) prosecuted the medical malpractice suit as administratrix of the estate.

The investors argue that the duty of an attorney preparing a tax opinion letter differs from the duty generally owed by an attorney to third parties. Their authority for that proposition, while perhaps attractive in other respects, finds no basis in Indiana law. The plaintiffs cite a Securities and Exchange Commission opinion letter reported at CCH Federal Securities Law Reporter § 82,874 at 84,326 (June 1, 1981), but that opinion letter appears to do no more than to stress the importance of investigation and to question the competence and/or integrity of an attorney who fails to do so. The SEC opinion letter does not purport to render attorneys liable to third persons nor could it reasonably do so with respect to Indiana common law.

The plaintiffs next cite *Norman v. Brown, Todd & Heyburn*, 693 F.Supp. 1259 (D.Mass.1988), which upheld a complaint in the face of a motion to dismiss, holding that under Massachusetts law an attorney could be liable to a third party whose reliance on a tax opinion letter was reasonably foreseeable. 693 F.Supp. at 1265. *Norman* does not address Indiana law, however. Further, in *Toro*, the Seventh Circuit appears to have agreed with the district court, *see Toro Co. v. Krouse, Kern & Co., Inc.*, 644 F.Supp. 986, 992 (N.D.Ind.1986), that Indiana does not follow the "reasonably foreseeable" test that appears to have governed *Norman*.

The investors also rely upon the unpublished decision in *Beeson v. Producers Brokerage*, IP 83–1872–C (S.D.Ind., February 12, 1987). That decision, however, addressed potential liability under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities Exchange Commission. Although rendered by a district court sitting in Indiana, *Beeson* did not involve application of Indiana law.

Finally, the investors point to a series of cases decided under Michigan law and to an ABA formal opinion and a treasury circular. Those authorities are unpersuasive

with respect to Indiana law, which, as noted above, governs this claim. The ABA opinion and the treasury circular may state accurately the duty of an attorney issuing a tax shelter opinion letter, but they cannot expand Indiana law concerning the persons to whom the duty is owed.

One case upon which the investors rely would bear a relationship to Indiana law. As noted above, Indiana's rule is based on the *Ultramares* doctrine established by the New York Court of Appeals; in *Toro*, the Seventh Circuit turned to New York law to illuminate Indiana law. In *Vereins–UND Westbank, AG v. Carter*, 691 F.Supp. 704 (S.D.N.Y.1988), the *Ultramares* doctrine was applied to a suit against attorneys under New York law. That case's holding provides little support to the plaintiffs here, however. The *Vereins* court concluded the purpose of the *Ultramares* doctrine—to prevent a professional from facing suits brought by indeterminable class members over an indeterminable time—would not be undermined by a finding of liability to parties whose participation in the transaction was specifically contemplated by the attorney, as evidenced by the letters at issue. In contrast to *Vereins*, the plaintiffs in this case number nearly one hundred.

The investors also note a New York trial court decision, *Alpert v. Shea Gould Climenko & Casey*, discussed in *Vereins* but apparently reported only in the New York Law Journal, in which the court upheld a claim that appears to have been quite similar to those raised here. The *Vereins* court did not discuss *Alpert* in conjunction with the scope of potential plaintiffs under the *Ultramares* doctrine, but rather only with respect to the doctrine's applicability to attorneys, an issue already resolved under Indiana law by *Walker v. Lawson*, 526 N.E.2d 968. Indeed, the *Vereins* court questioned the *Alpert* court's definition of the duty imposed under the *Ultramares* doctrine. 691 F.Supp. at 712 n. 12.

Whatever may have been held in *Alpert*, however, the court deems it inappropriate to skirt or expand established Indiana law on the strength of an unreported decision by a trial court of another state.

Although they do not say so directly, it appears that the plaintiffs would have the court carve out an exception to the *Essex* rule for attorneys who prepare tax opinion letters, as opposed to performing other legal services. Indiana's courts have not had occasion to confront this precise issue, but they have followed the *Ultramares* doctrine unwaveringly. Indiana's courts might find reason for an exception such as that sought by the plaintiffs, but to create such an exception would amount to a distinct change of the course of Indiana law. An attorney preparing a tax opinion letter would appear to differ from an accountant preparing financial information, *see Toro Co. v. Krouse, Kern & Co., Inc.*, 827 F.2d 155, only with respect to the breadth of the class of persons who might be affected adversely by any negligent misrepresentation. Concern of such broad-based liability to persons unidentifiable at the time of the professional's conduct undergirds Indiana's adherence to the *Ultramares* doctrine. *See Essex v. Ryan*, 446 N.E.2d at 373–374.

The Seventh Circuit has cautioned that federal courts must exercise restraint in expanding state law or declaring new state law principles, *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987), and that federal courts are not the place to press innovative theories of state law. *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936 (7th Cir.1986). With these principles in mind, the court must decline to expand Indiana law by carving an exception to the *Ultramares* doctrine that would apply when investors claim against an attorney who negligently prepared a tax opinion letter.

■ Under Indiana law, the existence of a duty is a question of law for the court, not an issue for the jury. *Teitge v. Remy Construction Co., Inc.*, 526 N.E.2d 1008, 1010 n. 3 (Ind.App.1988). Under the present state of Indiana law, Mr. Schwartz and his firm owed no duty to the plaintiff-investors. The defendants are entitled to summary judgment on Count I of the amended complaint.

## IV. COUNT II: THE FEDERAL SECURITIES CLAIMS

Count II of the amended complaint alleges that the defendants violated various provisions of federal securities laws. The court addresses each such claim in turn.

### A. Sections 12(1) and (2) of the Securities Act of 1933

15 U.S.C. § 77l (1) and (2) provide:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

■ The defendants maintain that: (1) the plaintiffs are not "sellers" within the meaning of Section 12(1), citing *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), or Section 12(2); (2) the aiding and abetting theory of secondary liability does not apply to Section 12 claims; and (3) the one year statute of limitations, 15 U.S.C. § 77m, bars the plaintiffs' claims under sections 12(1) and 12(2). Because the court agrees that the defendants were not "sellers" within the meaning of Section 12(1) or Section 12(2), the court need not address the merits of the defendants' statute of limitations arguments.

In *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court rejected the "substantial factor" test for determining liability under Section 12(1) of the Securities Act of 1933, holding:

... there is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers ... Congress did not intend that the section impose liability on participants collateral to the offer or sale.

108 S.Ct. at 2080. The Court also rejected the theory that individuals who merely "participate in soliciting the purchase" could be considered sellers within the meaning of Section 12(1). *Id.* at 2081.

Mr. Schwartz and his firm were in no position to pass title to investors, and the plaintiffs have come forth with no evidence to suggest that Mr. Schwartz or his firm actively solicited any of them in an attempt to sell the 1983 lease program. While the defendants may have made a significant contribution (intentionally or unintentionally) to the solicitation materials and, thus, may be said to have "participate[d] in soliciting the purchase", such limited participation does not make them sellers within the meaning of Section 12(1). *Id.*

For similar reason, the court finds that the plaintiffs' claims under Section 12(2) to be without merit. The Seventh Circuit has interpreted Section 12(2) to require strict privity between the plaintiff-purchaser and the defendant-seller. *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1226 (7th Cir.1980), *cert. denied* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981). No such privity exists here.

■ The court declines the plaintiffs' invitation to adopt the more liberal "substantial factor" test which would impose liability under Section 12(2) on anyone whose participation was a substantial factor in

causing the securities sale. Although the Seventh Circuit recently questioned the continuing viability of the strict privity requirement, *see Schlifke v. Seafirst Corp.*, 866 F.2d 935, 940 (7th Cir.1989), it did not reverse its previous dictum in *Sanders*, but rather avoided the issue as non-dispositive. This court finds no reason to define the defendant class under Section 12(2) differently from that of Section 12(1). As previously noted, *Pinter* has specifically rejected the "substantial factor" test for assessing Section 12(1) liability. *Pinter v. Dahl*, 108 S.Ct. at 2080. So too, this court rejects the "substantial factor" test for assessing liability under Section 12(2). The court believes liability under Section 12 generally requires more active participation in the solicitation than the mere drafting of an opinion letter. *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir.1986).

The plaintiffs' contention that the defendants are secondarily liable under an "aiding and abetting" theory is inconsistent with the express language of Sections 12(1) and (2) and with the holdings of *Pinter* and *Schlifke. See Ambling v. Blackstone Cattle Co., Inc.*, 658 F.Supp. 1459, 1467–68 (N.D.Ill.1987) (rejecting aiding and abetting theory of liability under Section 12(2)); *Wilson v. Saintine Exploration & Drilling Corp.* 872 F.2d 1124 (2d Cir.1989).

### B. Section 10(b) and Rule 10b–5 Claims

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, which was promulgated under that Act, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

Had the plaintiffs asserted primary liability against Mr. Schwartz and his firm under § 10(b) and Rule 10b–5, they would have been required to show: (1) that the defendants intentionally or recklessly (2) misrepresented or omitted a material fact (3) in connection with the purchase or sale of a security, (4) on which the plaintiffs relied ("transaction causation"), and (5) which proximately caused the plaintiffs' losses ("loss causation"). *Schlifke v. Seafirst Corp.*, 866 F.2d at 943, 946; *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543, 549 and n. 24 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The defendants contend that summary judgment is appropriate with respect to these claims because the plaintiffs have failed to establish either "loss causation", *citing Bastian v. Petren Resources Corp.*, 681 F.Supp. 530, 533–34 (N.D.Ill.1988), or scienter (intent to mislead) on the part of the defendants. The court agrees with the plaintiffs on the issue of "loss causation",

but agrees with the defendants on the scienter issue.

### 1. Causation

The plaintiffs must show both "transaction causation" and "loss causation". *LHLC Corp. v. Cluett, Peabody & Co., Inc.,* 842 F.2d 928, 931 (7th Cir.), *cert. denied* — U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988); *Manufacturers Hanover Trust v. Drysdale Securities Corp.,* 801 F.2d 13, 20 (2nd Cir.1986), *cert. denied* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

> The plaintiff must prove not only that, had he known the truth, he would not have acted ["but for" causation], but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*Huddleston v. Herman & MacLean,* 640 F.2d at 549. "The injury should reflect the [fraudulent] effect either of the violation or of [fraudulent] acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1050 (7th Cir.), *cert. denied* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

 For summary judgment purposes, the defendants do not dispute the existence of transaction causation. It is alleged, although unproven at this point, that the plaintiffs relied on the opinion letter in making their investments and would not have engaged in the transaction had the defendants presented the true facts. Such reliance is presumed where the claims are predicated on material mis-

representations or omissions. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d at 1049.

To the extent the defendants maintain that the plaintiffs have failed to come forth with sufficient evidence of "loss causation", the court disagrees. "'Loss causation' means that the investor would not have suffered a loss if the facts were what he believed them to be ..." *LHLC Corp. v. Cluett, Peabody & Co., Inc.,* 842 F.2d at 931. A jury reasonably could conclude that had the facts been as represented to investors in the opinion letter, the plaintiffs would not have suffered a loss. The misrepresentations clearly "touch[ed] upon the reasons for the investment's decline in value". *Huddleston v. Herman & MacLean,* 640 F.2d at 549.

The plaintiffs have presented evidence which would show, contrary to the defendants' position, that the diversion of funds by VanWaeyenberghe and Leibowitz was not the sole proximate cause of their injuries or the sole reason for the decline in the value of their investment. Even had the money not been diverted and the equipment been manufactured, the tax benefits promised in the opinion letter would not have been available to the plaintiffs in the year 1983 because the intended sublessee, OPEC, had no operational facility within which to incorporate the equipment, the plaintiffs were ineligible for the credits under the "non-corporate lessor" rule which required them to incur expenses in excess of the amount expended as "prepaid rent", and the equipment had been substantially overvalued.

### 2. Scienter

 The element of scienter (intent to mislead) may be satisfied by a showing of reckless conduct. *See Goldberg v. Household Bank, F.S.B.,* 890 F.2d 965, 967, (7th Cir.1989); *Schlifke v. Seafirst Corp.,* 866 F.2d at 946; *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d at 1045. "Reckless conduct" has been defined:

> ... as a highly unreasonable omission, involving not merely simple, or even

inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d at 1045, *quoting Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okla.1976); *see also Schlifke v. Seafirst Corp.*, 866 F.2d at 946. In support of their position that the defendants' conduct was reckless, the plaintiffs have submitted the affidavit of Glen Scolnik and the deposition testimony of others experienced in the area of securities law, such as Robert Clemente, Steven Koegler, Charles Appleby, and Alan Roeder. It is the general consensus of these individuals that the sale of the 1983 leasing program constituted the sale of a security and imposed upon the defendants the duty to verify the material factual representations surrounding the transaction before issuing their opinion; that the defendants breached that duty; that there is a definite risk or danger of misleading investors if the issuers' representations are accepted at face value; and that under similar circumstances they would have never agreed to issue an opinion or would have withdrawn it if already issued.

### a. The Scolnik Affidavit

Mr. Schwartz and his firm ask that Mr. Scolnik's affidavit be stricken. They base their objections in part upon technical shortcomings (documents to which the affidavit refers were not attached, the affidavit contains no averment of personal knowledge), and upon the fact that Mr. Scolnik provided a legal opinion as to an ultimate issue of fact. The defendants specifically object to paragraphs 9 and 10 of Mr. Scolnik's affidavit in which he opines that:

... the conduct of Schwartz ... was highly unreasonable, constituted an extreme departure from the standards of ordinary care, and presented a danger of misleading buyers that was either known to Schwartz or was so obvious that he must have been aware of it....

Schwartz['s] conduct was so reckless as to constitute scienter under Rule 10b–5 promulgated by the SEC.

In response to the defendants' motion to strike Mr. Scolnik's affidavit, the plaintiffs maintain that Mr. Scolnik's affidavit is provided as expert opinion testimony and is admissible under Rules 702–705 of the Federal Rules of Evidence without the need to disclose the facts upon which the opinion is based, and that under Rule 704 an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact. The plaintiffs further contend that although copies of the documents referred to in the affidavit were not attached, they are a part of the record before the court.

While Mr. Schwartz and his firm argue that the language of Rule 56(e) excludes from consideration an expert's opinion presented in the form of an affidavit, there is case authority to the contrary. *See Bulthuis v. Rexall Corp.*, 777 F.2d 1353 (9th Cir.1985); *Case & Co., Inc. v. Board of Trade*, 523 F.2d 355 (7th Cir.1975). The court finds that while Mr. Scolnik's affidavit may be technically flawed, his competency to testify as an expert has been sufficiently established for summary judgment purposes, that, as such, his opinion would potentially be admissible at trial under Fed. R.Evid. 702–705, that it is cumulative of other deposition testimony submitted by the plaintiffs, and will be considered for purposes of summary judgment.

But to hold that the affidavit is not subject to a motion to strike is not to hold it sufficient to preclude summary judgment. Mr. Scolnik simply recited twenty-nine documents that he had reviewed (including unsigned affidavits) and stated his conclusion. In *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir.1989), the court discussed the deficiency of such an approach:

Rule 705 of the Federal Rules of Evidence allows experts to present naked opinions. Admissibility does not imply utility. Professor Bryan presented nothing but conclusions—no facts, no hint of

an inferential process, no discussion of hypotheses considered and rejected. Rule 56(e) of the Federal Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall "set forth facts" and by implication in the case of experts (who are not "fact witnesses") a process of reasoning beginning from a firm foundation.... "It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment." ... An "opinion has a significance proportioned to the sources that sustain it." ... An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.

\* \* \* \* \* \*

Bryan offered the court his CV rather than his economic skills. Judges should not be buffaloed by unreasoned expert opinions.... Judge Hart was not.

877 F.2d at 1339–1340 (citations omitted). Mr. Scolnik, like Professor Bryan in *Mid-State Fertilizer Co.*, offered nothing more than an unsupported opinion. Accordingly, while the court deems it inappropriate to strike the affidavit in light of Rule 704 and 705 of the Federal Rules of Evidence, neither does the court deem it appropriate to attribute the affidavit any evidentiary weight.

### b. Recklessness

The law in this circuit currently identifies four requirements for aiding and abetting liability under § 10(b) and Rule 10b–5:

(1) the existence of a securities law violation by the primary party (in this case Mr. VanWaeyenberghe and Mr. Leibowitz);

(2) "knowledge" of this violation, or a "reckless disregard for the truth" on the part of the aider and abettor; ·

(3) the commission by the aider and abettor of one of the "manipulative or deceptive" acts proscribed under section 10(b) and Rule 10b–5 with the same degree of scienter required for primary liability; and

(4) substantial assistance by the aider and abettor in the achievement of the primary violation.

*Schlifke v. Seafirst Corp.*, 866 F.2d at 947; *First Interstate Bank of Nevada*, 837 F.2d at 779–80 and n. 4; *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d at 496.

Mr. Schwartz and his firm do not dispute the existence of a primary violation by VanWaeyenberghe and Leibowitz. To the extent they contend that the plaintiffs have failed to demonstrate that the defendants committed a "manipulative or deceptive" act proscribed under § 10(b) or Rule 10b–5, the plaintiffs maintain that the defendants' preparation of the allegedly misleading opinion letter constituted a "manipulative or deceptive act" as required for aiding and abetting liability under *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d at 495. They also argue that the defendants' silence regarding the alleged misrepresentations and omissions by Van-Waeyenberghe and Leibowitz qualify as a "manipulative or deceptive act".

As the court noted in *Schlifke*,

[W]hen the alleged proscribed act is non-disclosure of the primary violator's fraudulent conduct,

"knowledge of a material omission is not enough to violate the act or rule. There must be a duty to disclose.... When the nature of the offense is a failure to "blow the whistle", the defendant must have a *duty* to blow the whistle. And this duty does not come from § 10(b) or Rule 10b–5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law."

*Schlifke v. Seafirst Corp.*, 866 F.2d at 948, *quoting Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d at 495–96. *See also Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322 (7th Cir.1989) (accountants); *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 932–33 (7th Cir.), *cert. denied* — U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988).

As noted in the discussion of the common law malpractice claim, Indiana law created no duty to notify the plaintiffs of the tax letter's deficiencies after its issuance, and the plaintiffs have identified no other source of such a duty.[3] Accordingly, if the investors are to prove recklessness, they must do so with respect to Mr. Schwartz's conduct in issuing the letter. In pursuit of this burden, the plaintiffs note that before issuing the letter, Mr. Schwartz felt it contained an offering of a security, yet allowed his letter to be included in the offering materials knowing that it would be distributed to the public and knowing that no compliance with securities laws was occurring. Further, the plaintiffs argue, Mr. Schwartz performed no "due diligence" inquiries despite knowing that:

(1) he had, at best, nominal contact with his client;

(2) all his information had come from either VanWaeyenberghe (a new client) or Leibowitz (whom he knew to be an attorney suspended from the practice of law);

(3) every item of equipment in the transaction, whether a vat, still, or compressor tank, was represented to have a value of $100,000.00;

(4) he represented that he had "reviewed all relevant documents" and that the agreements reviewed represent the entire agreement between the parties, but he had received no documents;

(5) he stated ("implied" may be a more accurate term in that the letter sets forth the obligation, followed by the statement that the opinion letter complies with the obligation) that he had satisfied himself that the offering materials accurately and completely described the material facts, but he had not reviewed the offering materials;

(6) he stated (or more accurately, repeated the representation that) the entities involved in the lease transaction were unrelated, despite knowledge that OPEC intended to acquire MEL, and that inter-corporate activities were anticipated;

(7) he stated, without basis for opinion, that the equipment's market price would not be less than its purchase price;

(8) he stated that the terms of the purchase and lease were "arms lengths" transactions, when the leases were not extant when the opinion letter was drafted, and Mr. Schwartz had not discussed the leases' terms with MEL;

(9) he opined that the IRS had no basis for challenge of the validity of fair market value to the lessee when he had not attempted to acquire a basis for an opinion of the equipment's fair market value; and

(10) he failed to disclose that two of the entities had not been incorporated until a month before the opinion, and that MEL, Goodwrench, and OPEC each lacked any assets and any prior experience in the operation, manufacture, or leasing of ethanol equipment.

3. The plaintiffs refer to Formal Opinion 346 of the ABA Committee on Ethics and Professional Responsibility as a possible source of such a duty. That opinion, however, creates no such duty to potential investors. The opinion sets forth duties owed to potential investors when an attorney prepares a "tax shelter opinion", but defines that term as follows:

A "tax shelter opinion", as the term is used in this Opinion, is advice by a lawyer concerning the federal tax law applicable to a tax shelter if the advice is referred to either in the offering materials or in connection with sales promotion efforts directed to persons other than the client who engages the lawyer to give the advice. The term includes the tax aspects or tax risks portion of the offering materials prepared by the lawyer whether or not a separate opinion letter is issued. The term does not, however, include rendering advice solely to the offeror or reviewing parts of the offering materials, so long as neither the name of the lawyer nor the fact that a lawyer has rendered advice concerning the tax aspects is referred to at all in the offering materials or in connection with sales promotion efforts. In this case the lawyer has the ethical responsibility of assuring that in the offering materials and in connection with sales promotion efforts there is no reference to the lawyer's name or to the fact that a lawyer has rendered tax advice.

Accordingly, the letter at issue here was not a "tax shelter opinion" as defined in the ABA opinion. Mr. Schwartz's unsuccessful efforts to prevent his letter's inclusion in the offering materials are discussed below.

Plaintiffs' Response to Summary Judgment Motion, at 84–86.[4] From this point forward, however, the parties cast the court into a sea of conclusions. The plaintiffs conclude these failures and misstatements constitute the recklessness necessary to meet their burden of proving scienter; the defendants conclude that these failures and misstatements, if proven, constitute nothing more than negligence and certainly not gross or severe negligence. Neither side articulates why the foregoing facts, if proven, would constitute recklessness rather than negligence, or vice versa.

The distinction between negligence and recklessness is a fact-sensitive one in which prior decisions are unlikely to command one result or another.[5] Because "recklessness" stands in the place of actual intent for purposes of Rule 10b–5, "the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even 'white heart/empty head' good faith." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d at 1045; *accord, Rankow v. First Chicago Corp.*, 678 F.Supp. 202, 206 (N.D. Ill.1988). Accordingly, the argument for recklessness hinges upon the proposition that Mr. Schwartz knew of the likelihood that investors would rely upon the opinion letter. That which might be grossly reckless in a letter destined for investors, *see, e.g., Beeson v. Producer's Brokerage*, No. IP 83-1872-C (S.D.Ind., Feb. 12, 1987) (Dillin, J.) ("Gilbert knew that defendant . . . intended to use said letters in the PBC brochure that was distributed to the public"), might be nothing more than negligence in a letter destined only for the client, *see Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490; *see generally Stokes v. Lokken*, 644 F.2d 779, 784 (8th Cir.1981) ("where there is a minimal showing of substantial assistance, a greater showing of scienter is required"). The omissions and misrepresentations in the defendants' opinion letter, which purports to be based on representations from the client, are such matters.

A review of the plaintiffs' brief in opposition to the summary judgment motion discloses only two factual underpinnings for the claim that Mr. Schwartz knew that the letter would be, or was likely to be, distributed to investors.[6] First, they note that Mr. Schwartz placed no limit on the letter's face with respect to distribution[7] and, indeed, authorized the letter to be sent to third persons, such as investment advisors,

4. The plaintiffs have picked and chosen among Mr. Schwartz's instances of conflicting testimony in developing their list of things they claim he knew. At various times, Mr. Schwartz has denied knowledge of some of the items in the plaintiffs' list.

5. "Negligence" varies from "gross negligence" only in degree; Dean Prosser's reviser believes that in tort law "gross negligence" tends to merge with "recklessness" taking on the same meaning, W. Keeton, *Prosser and Keeton on Torts*, § 34, at 214 (5th ed. 1984); while in criminal law, "recklessness" connotes conduct so dangerous that the defendant's knowledge of the risk can be inferred, *see generally Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir. 1985); and some courts, perhaps including the Seventh Circuit, require something beyond simple recklessness for scienter under § 10b–5. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d at 496; *Woods v. Barnett Bank*, 765 F.2d 1004, 1010 (11th Cir.1985); *Stokes v. Lokken*, 644 F.2d 779, 784 (8th Cir.1981).

6. The plaintiffs also note that at least two weeks before the first of the plaintiffs purchased the investment, Mr. Schwartz knew that his opinion letter was part of the "blue booklet" that VanWaeyenberghe and Leibowitz intended to distribute to investors, and that on September 23, 1983, Mr. Schwartz wrote Milligan a letter concerning a proposal to establish an escrow fund for the defense of IRS challenges investors' claims of credits. As noted above, however, absent some duty to "blow the whistle" independent of the securities laws, the court cannot consider subsequent omissions as proof of scienter. Further, Mr. Schwartz's post-issuance conduct does not tend to show his state of mind at the time of issuance.

7. Mr. Schwartz testified in his depositions that he had verbally instructed VanWaeyenberghe and Leibowitz not to include the opinion letter in any offering materials. Exhibit 7, Plaintiffs' Appendix to Response to Summary Judgment Motion, at 234–235. *Cf.* Exhibit 8, Plaintiffs' Appendix to Response to Summary Judgment Motion, at 65; Exhibit 5, Defendants' Appendix to Summary Judgment Motion, at 196–198; Exhibit 6, Defendants' Appendix to Summary Judgment Motion, at 65–66.

attorneys, and accountants. Plaintiffs' Response to Summary Judgment Motion, at 10. Second, they present the deposition opinion of Charles Appleby, a CPA, that the letter was drafted with the anticipation that investors would rely on it because the letter discussed tax ramifications to investors, the letter stated that individual investors' leases had been reviewed, and the letter's structure indicated that it was directed to outside investors. Plaintiffs' Response to Summary Judgment Motion, at 21.[8]

This factual underpinning is insufficient as a matter of law. As explained in *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d at 496–497:

> The plaintiffs insist that the Firms *must* have known that the Foundation's selling documents were inaccurate and, because they did not do anything to stop the sales and answered queries from the Trustee, they *must* have had the necessary mental state. If this were enough to establish scienter, however, the scienter doctrine would not do anything to distinguish liability under § 10(b) and Rule 10b–5 from the presumptive or absolute liability under §§ 11, 12, 15, and 20. A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant "must have had" knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.

The investors have proceeded no further than did the plaintiffs in *Barker.* They have presented nothing to support the inference that Mr. Schwartz or his firm knew, when they issued the opinion letter, of a strong likelihood that MEL, Leibowitz, or VanWaeyenberghe would distribute the letter to potential investors. Absent such proof, no reasonable jury could find that the defendants' alleged omissions and/or misrepresentations amounted to recklessness. Accordingly, the defendants are entitled to judgment as a matter of law on the plaintiffs' claims under § 10(b) and Rule 10b–5.

## V. COUNT III: INDIANA SECURITIES LAW

IND. CODE 23–2–1–19 provides a private cause of action against individuals who fall within any of the categories

---

**8.** In response to an interrogatory asking the factual basis of the investors' allegation that the defendants knew when they issued the opinion letter that the opinion would be made a part of the offering brochure, the investors replied:

> All information acquired by the defendants relating to the 1983 leasing program between MEL and the investors was received from either Carl Leibowitz, an officer of OPEC, or Gary Van Waeyenberghe, another officer of OPEC. Leibowitz and Van Waeyenberghe advised Schwartz that OPEC hoped to be the sublessee of all of the items of equipment leased through MEL. In fact, Schwartz was requested to prepare the lease agreements between not only MEL and the investor but also the sublease between the investor and OPEC, at approximately the same time that the defendants were requested to draft the tax opinion letter.
>
> Van Waeyenberghe had delivered to Schwartz some drafts of proposed offering materials, which indicated the tax benefits available through the MEL leasing program.
>
> The tax opinion itself, although addressed to the board of directors of Multi–Equipment Leasing, is exclusively devoted to an analysis of the tax implications which the investor, rather than MEL, would face. Schwartz, being a knowledgeable attorney, was aware that the purpose of a tax opinion letter, in connection with a tax advantageous offering, is to explain tax benefits to the investor, rather than to his client, Multi–Equipment Leasing, and therefore the opinion would have had little value if it was not meant to be distributed to the investors for their review.
>
> A tax opinion for MEL would have addressed the tax consequences to MEL, and would have been substantially less formal than the opinion issued.
>
> The opinion itself makes reference to proposed Treasury regulations as well as the ABA Formal Opinion 346, and both the opinion and Schwartz in his deposition have stated that those proposed regulations and Formal Opinion set the standard of care applicable to him in drafting the opinion. ABA Opinion 346 makes it extremely clear that a tax opinion in a tax shelter offering is crucial to the successful promotion of a tax shelter investment and is meant to be relied upon by the investors.
>
> Schwartz was also asked by Leibowitz or Van Waeyenberghe whether he would be willing to do the securities compliance necessary for the offering.

set out in IND. CODE 23–2–1–19(b) for violation of any of the provisions of the state's securities laws. In Count III of their amended complaint, the plaintiffs maintain that Mr. Schwartz and his firm fall within the last category provided under subsection (b) in that they are "agent[s] who materially aid[ed] in the sale" of an unregistered security. The defendants argue that they are not agents within the meaning of the Indiana Securities Act.

Indiana courts apparently have yet to rule on the applicability of the state's securities laws to attorneys. As noted in Part III of this memorandum, respect for state courts as the primary expositors of state law counsels restraint by a federal court in expanding state law or announcing new state law principles. *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987). In the absence of a controlling state decision, a federal court is to decide the question as it believes the state supreme court would decide it. *Bowen v. United States*, 570 F.2d 1311 (7th Cir.1978). "Under the principles of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court must apply the state law as declared by the highest state court or otherwise by the intermediate appellate court of the state. It has limited discretion to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir.1987).

IND. CODE 23–2–1–1(b) defines "agent" as:

> ... any individual ... who represents ... issuer in effectuating or attempting to effect purchases or sales of securities. A partner, officer or director of ... issuer, or a person occupying a similar status or performing similar functions is an agent only if he effects or attempts to effect the purchase or sale of securities in Indiana.

The defendants take the position that the term "agent" includes only employees of a broker-dealer or issuer whose business is selling securities. The only authority cited for that position, however, is a reference to the licensing, examination, and registration requirements for agents, 710 IAC 1–15–1 through 1–15–4. The defendants conclude that "the status of an agent is dependent on transactions involving sales", (Brief, p. 40), and that there are no facts showing that Mr. Schwartz and his firm were involved in "sales" to the plaintiffs.

The court disagrees. IND. CODE 23–2–1–1(b) generally defines "agent" to include any individual who represents the issuer (in this case, MEL, VanWaeyenberghe, and Leibowitz) and who "effects or attempts to effect the purchase or sale of securities in Indiana". It is not limited to broker-dealers, their employees, partners, officers, or directors. IND. CODE 23–2–1–1(b) thus could conceivably include attorneys such as Mr. Schwartz, but "only if [the attorney] effects or attempts to effect the purchase or sale of securities in Indiana". The question thus turns on the meaning of "effect".

According to Webster's *Third New International Dictionary* (1981), "to effect" something is "to bring about especially through successful use of factors contributing to the result."

It has been presumed to this point that the plaintiffs relied upon the defendants' opinion letter in making their investment decision, and that they would not have invested in the 1983 leasing program had the true facts been disclosed. While the opinion letter may have been "a factor contributing to the result" (the ultimate sale), no evidence suggests that Mr. Schwartz or his firm personally and actively employed the opinion letter to solicit investors. In other words, Mr. Schwartz and his firm cannot be said to have effected or attempted to effect the sale of a security. Liability under the Indiana Securities Act requires something more than the mere drafting of an opinion letter. Accordingly, the defendants are entitled to judgment as a matter of law with respect to the plaintiffs' claims under that Act.

## VI. COUNT IV: INDIANA'S CORRUPT BUSINESS INFLUENCES ACT

 Count IV of the investors' amended complaint seeks to hold Mr. Schwartz

and his firm liable under Indiana's Civil Remedies for Corrupt Business Influences Act, IND. CODE 34-4-30.5-1 et seq. The defendants seek judgment on the ground that the plaintiffs are not "aggrieved persons" entitled to sue under IND. CODE 34-4-30.5-1, that the defendants have no liability for the alleged underlying predicate offenses, that the complaint does not allege a sufficient "pattern of racketeering activity", and that the alleged violation of IND. CODE 35-45-6-2 did not cause the investors' claimed losses.

The depth of the parties' disagreement is illustrated by their inability to agree even on whether the case is governed by the Indiana Corrupt Business Influence Act as it exists today or as it existed before amendment in 1985. The challenge to the court is illustrated by the parties' failure to explain why the issue is important. Before its amendment in 1985, IND. CODE 34-4-30.5-1 defined "aggrieved person" as "a person who owns an interest in real property or in an enterprise that is the object of a corrupt business influence." Today, " '[a]ggrieved person' means a person who has an interest in real property or in an enterprise that: (1) is the object of a corrupt business influence (IC 35-45-6-2); or (2) has suffered damages or harm as a result of corrupt business influence (IC 35-45-6-2)." The significance of the amendment to this case is, at best, elusive.

Mr. Schwartz and his firm argue that the investors had no interest in real property or an enterprise. Under either incarnation, the statute refers the reader to IND. CODE 35-45-6-1, the criminal counterpart of the state's civil corrupt influences act, for the definition of "enterprise". The criminal statute (the immaterial 1984 amendment of which was not noted by the parties) defines "enterprise" as "a (1) sole proprietorship, corporation, partnership, business trust, or governmental entity; or

(2) union, association, or group, whether a legal entity or merely associated in fact."

Despite the breadth of the state concept of "enterprise", the investors prove unable to identify the enterprise in which they claim to have had an interest that was damaged or the object of a corrupt business influence. They explain, "It is easier to view the transaction, and the concept of 'enterprise' if we take a more simplistic approach and refer, for discussion's sake, to the fact that the enterprise is 'MEL'." Plaintiffs' Response to Summary Judgment Motion, at 107.[9] They reason that each investor acquired an interest in MEL when they made their investments and Mr. Schwartz issued the opinion letter to MEL for delivery to the investors. They go on to argue, however, "Schwartz is associated with MEL. It is his client.", *id.* at 108, and that Mr. Schwartz aided and abetted MEL in obtaining funds through the issuance of the letter. Further, Mr. Schwartz aided and abetted MEL or Leibowitz who, with intend to defraud the plaintiffs, concealed, encumbered, or transferred property or violated state securities laws. Finally, they argue, Mr. Schwartz and his firm diverted moneys from MEL.

The argument is circular. At various points in the argument, the investors own an interest in, then are defrauded by, the enterprise, while Mr. Schwartz advises, aids and abets, and finally steals from, the enterprise. Under any view of the plaintiffs' argument, the investors and Mr. Schwartz and his firm all are members of the enterprise. Indiana's RICO Act cannot be construed as simply providing a method to resolve intramural disputes among racketeers.

In any event, the materials before the court do not support the investors' core proposition that they acquired an interest in MEL when they made their investments. MEL agreed to lease equipment to the in-

---

9. In their responses to the defendants' interrogatories, the plaintiffs identified the "enterprise" as

... an association in fact consisting of one or more of the following members: Gary Van Waeyenberghe, Carl Leibowitz, Larry Slabaugh, Multi-Equipment Leasing Corp., OPEC, Goodwrench Industries, Inc., Robert Milligan, Mid-Continent (exact name unknown), Jack Prewitt, Howard Schwartz, Bassey, Selesko & Cousins, P.C., International Communications, Inc., Michigan Peninsular Airways, and Van Waeyenberghe Enterprises, Inc.

vestors, and the investors paid what was to be pre-paid rent. One who leases property does not acquire an interest in the lessor.

The plaintiffs have not shown themselves to be "aggrieved persons" for purposes of Indiana's Corrupt Business Influences Act. The defendants are entitled to judgment as a matter of law on Count IV of the plaintiffs' amended complaint.

## VII. COUNT V: THE FEDERAL RACKETEERING ACT

Count V of the investors' amended complaint attempts to state a claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and Mr. Schwartz and his firm seek summary judgment on that claim. Where the parties found no common ground as to which state provides the governing law as to Count I, and could not agree on the language of the statute governing Count IV, their arguments as to Count V miss each other altogether.

18 U.S.C. § 1964(c) provides civil remedies for certain injuries resulting from violation of any of the four independent subsections of 18 U.S.C. § 1962. Subsection (a) of § 1962 addresses investment of proceeds derived from a pattern of racketeering activity; subsection (b) deals with acquiring or maintaining an interest in an enterprise through a pattern of racketeering activity; subsection (c) prohibits participation in the affairs of an enterprise through a pattern of racketeering activity; and subsection (d) prohibits conspiracy to

violate any of the other subsections. These subsections establish separate violations with separate elements. *See generally, Haroco v. American National Bank & Trust Co.,* 747 F.2d 384, 401–402 (7th Cir. 1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

Count V of the amended complaint alleges that the plaintiffs are entitled to recover under § 1964(c) because the defendants violated § 1962(b). Mr. Schwartz and his firm seek judgment on the ground, *inter alia,* that the plaintiffs cannot come forward with evidence that the defendants acquired or maintained an interest in, or control of, an enterprise through a pattern of racketeering activity. Such proof is necessary to establish a violation of subsection (b).

The investors do not confront that argument. Instead, they note that their answers to interrogatories informed the defendants that they intended to pursue their claim under subsections (a), (b), and (c). They then address the sufficiency of their evidence under subsection (c). The plaintiffs make no argument concerning subsection (b). In reply, Mr. Schwartz and his firm argue that since subsection (c) was not pleaded in the amended complaint and the plaintiffs made no effort to demonstrate the existence of a factual dispute under subsection (b) (the pleaded subsection), they are entitled to judgment as a matter of law. Accordingly, the court must determine what RICO violations the plaintiffs have alleged in the amended complaint now before the court.[10]

---

10. The amended complaint now before the court is the fourth filed by the investors. The investors sought to present their claims against Mr. Schwartz and his firm by intervening, briefly, in this court's Cause No. S85–190, a suit brought by the United States Internal Revenue Service against MEL, Milligan, OPEC, Van Waeyenberghe, Leibowitz, Goodwrench, and Slabaugh. Because the investors sought to add to the government's complaint, their initial pleading was designated an amended complaint. Paragraphs 74 through 77 of that amended complaint, filed May 28, 1985, attempted to state claims under each of the four subsections of § 1962.

The investors filed a "second amended complaint" in the government's action on June 3, 1985, adding another intervening investor and

attaching another exhibit. Paragraph 74 through 77 remained unchanged, purporting to state claims under each of the four subsections of § 1962.

On September 16, 1985, the court reconsidered and vacated its order allowing the investors to intervene and dismissed the investors' complaint without prejudice. On December 5, 1985, the investors filed the complaint that commenced this suit. That complaint contained no allegations of RICO violations; it was grounded solely upon a theory of malpractice.

The investors filed their amended complaint on May 6, 1988, the final date allowed for amendments under the scheduling order entered on March 8, 1988 pursuant to Fed.R.Civ.P. 16(b). The investors have sought no further amendment. As noted, the amended complaint

Subsection (c) of 18 U.S.C. § 1962 provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Accordingly, the elements of a claim alleging violation of subsection (c) are that the defendants (1) were employed by or associated with (2) an enterprise engaged in or affecting interstate or foreign commerce, and (3) that the defendants participated in the conduct of the enterprise's affairs (4) through a pattern of racketeering activity. *Haroco v. American National Bank & Trust Co.*, 747 F.2d at 387.

 Count V of the amended complaint cannot be read as stating a claim under subsection (c) upon which relief can be granted. While Count V clearly states a claim under subsection (b), it contains no allegation that Mr. Schwartz or his firm participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.[11] Accordingly, Count V of the amended complaint states no claim under subsection (c) upon which relief can be granted.

Amendment of a complaint to add a new legal theory is permissible under Rule 15(a), Fed.R.Civ.P., but the plaintiffs have sought no such amendment, and a complaint may not be amended by statements in a brief. *Thomason v. Nachtrieb*, 888

F.2d 1202, 1205 (7th Cir.1989). Thus, regardless of whether the investors put the defendants on notice of possible additional claims in their interrogatory answers in December, 1988, the amended complaint states no claim under subsection (c); it states a claim only under subsection (b).

Essentially, the plaintiffs respond to this prong of the summary judgment motion, not with proof of their pleaded claim, but with an effort to show that they can prove a claim that they have not pleaded. The court cannot deem such a response sufficient. A party opposing a summary judgment must show not only that a genuine fact issue exists, but further that the disputed fact is material, or outcome-determinative, under applicable law. *Wainwright Bank & Trust Co. v. Railroadmen's Federal Sav. & Loan Ass'n*, 806 F.2d 146 (7th Cir.1986). The investors may have shown the existence of several disputed facts that would be material to a claim under subsection (c), but they have brought no such claim; the disputed facts that they have shown are not outcome-determinative under subsection (b). "The notion of materiality includes only those questions that are within the range of allowable controversy in a lawsuit. Under this standard, a fact is material only if it tends to resolve any of the issues that have been properly raised by the parties." C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2725, at 93 (1983). The investors' evidence and arguments under subsection (c) do not tend to resolve any of the issues that have been properly raised; only subsection (b) has been properly raised.

---

purports to state a claim under § 1962(b), but refers to no other subsection of § 1962.

**11.** Paragraph 55 sets forth allegations concerning the predicate acts supporting a RICO claim. Paragraph 56 alleges that the defendants, VanWaeyenberghe, Leibowitz, MEL, and OPEC, are persons within the meaning of 18 U.S.C. § 1961(3), RICO's definitional provision. Paragraph 57 alleges that the defendants, VanWaeyenberghe, Leibowitz, MEL, and OPEC, banded together as an association in fact, constituting an enterprise within the meaning of 18 U.S.C. § 1961(4). Paragraph 58 alleges that the defendants, VanWaeyenberghe, Leibowitz, MEL, and OPEC, engaged in at least three hundred acts of mail fraud, constituting a pattern of racketeer-

ing activity within the meaning of § 1961(5), and also contains the necessary allegations concerning timeliness. Paragraph 59 alleges:

> The defendants, and Van Waeyenberghe, Leibowitz, MEL and OPEC, through the commission of two (2) or more acts of fraud in the sale of securities and/or mail fraud, constituting a pattern of racketeering activity, directly or indirectly, maintained an interest in an enterprise, the activities of which affect interstate commerce, in violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1964(c).

Paragraph 60 alleges that the plaintiffs have been damaged as a result of the defendants' violations of 18 U.S.C. § 1961 *et seq.*

The plaintiffs have not, and have not attempted to, come forth with evidence that would suffice to withstand a motion for directed verdict on their claim under 18 U.S.C. § 1962(b). Accordingly, regardless of whether the plaintiffs could prove entitlement to recovery under an unpleaded theory, the defendants are entitled to judgment as a matter of law on the RICO claim pleaded in Count V of the amended complaint. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## VIII. CONCLUSION

The court intends no commendation of the defendants' handling of the opinion letter. However, the court cannot find that the laws under which the investors bring their suit support any of their claims arising from that letter. Accordingly, the court now DENIES the defendants' motion to strike the affidavit of Glen Scolnik and GRANTS the defendants' motion for partial summary judgment. The court now schedules this matter for a status conference on February 6, 1990 at 9:00 a.m.

SO ORDERED.